Todd L. NIXON, Appellant (Defendant),

v.

The STATE of Wyoming,
Appellee (Plaintiff).

No. 98–200.

Supreme Court of Wyoming.

Dec. 22, 1999.

Representing Appellant: Sylvia Lee Hackl, State Public Defender; Donna Domonkos, Appellate Counsel; Diane Courselle, Director, John Ketscher, Student Intern, and Michael C. Mace, Student Director, of the Wyoming Defender Aid Program. Argument by Messrs. Ketscher and Mace.

Representing Appellee: Gay Woodhouse, State Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Kimberly A. Baker, Senior Assistant Attorney General; Theodore E. Lauer, Director, and Jeff Oven and David Smith, Student Interns, of the Prosecution Assistance Program. Argument by Mr. Oven.

Before LEHMAN, C.J., and THOMAS, MACY, GOLDEN, and HILL, JJ.

GOLDEN, Justice.

Todd Nixon appeals his conviction, judgment and sentence for felony assault on a peace officer in violation of Wyo. Stat. Ann. § 6–5–204(b) (LEXIS 1999). Nixon claims his constitutional right to an impartial jury was violated when the trial court failed to transfer his trial to another county after negative pretrial publicity tainted the jury pool. He also argues the evidence was insufficient to prove his guilt beyond a reasonable doubt. Nixon's sentence included an order to pay restitution to the Wyoming Workers' Compensation Division (Division), which he claims violates Wyoming law because the Division is an insurer with a right of subrogation and, therefore, lies outside the definition of "victim" as contemplated by the victim restitution statutes, Wyo. Stat. Ann. §§ 7–9–101 et seq. (LEXIS 1999).

The trial court denied Nixon's motion to transfer venue only after *voir dire* was completed and a jury empaneled. The trial court is in the best position to determine whether potential jurors are biased, and we will not disturb its denial of a motion to transfer

venue absent an abuse of discretion. We perceive no such abuse here. Based on the evidence it heard, a rational jury could find Nixon guilty of felony assault on a peace officer. Because the Division is not an "insurer," the trial court's restitution order was appropriate. Therefore, we affirm the conviction, judgment and sentence.

## ISSUES

Appellant Todd Nixon presents three issues for our review:

I. Did the trial court deny Todd Nixon's constitutional right to a fair jury trial by denying Mr. Nixon's motion to transfer proceedings to a new venue, even though inflammatory pretrial publicity in the local community had prejudiced the public against Mr. Nixon?

II. Was there sufficient evidence to convict Todd Nixon of felony assault on a peace officer, in violation of Wyoming Statute § 6–5–204(b), when Mr. Nixon lacked intent to harm anyone while attempting to hug his mother, and when the alleged victim himself testified that he was not struck by Mr. Nixon?

III. Did the trial court err when it awarded restitution to the state worker's compensation division for payments made to Deputy Urman when insurers ordinarily are not eligible "victims" for purposes of the restitution statute?

Appellee State of Wyoming presents this statement of the issues:

I. Did the district court err in denying Appellant's motion to transfer the proceedings to a different county?

II. Was the evidence sufficient to permit the jury to find Appellant guilty of felony assault upon a peace officer in violation of Wyo. Stat. § 6–5–204(b)?

III. Did the district court err in ordering that Appellant pay $95 to the worker's compensation division as restitution for medical expenses paid for injuries to the victim?

## FACTS

In a separate matter, Nixon pleaded guilty to charges of first degree murder and aggra-vated assault for the death of his three-year-old stepdaughter and was sentenced for that crime on October 10, 1997. After he was sentenced, an altercation broke out in the courtroom between Nixon and the peace officers who were to escort him out of the room. One officer, Deputy Urman, sustained strained muscles and tendons in his shoulder and carpet burns to his right wrist. As a result of this incident, Nixon was charged with felony assault on a peace officer in violation of Wyo. Stat. Ann. § 6–5–204(b) (LEXIS 1999).

Before the trial on the assault charge, Nixon filed a W.R.Cr.P. Rule 21(a) motion to transfer the proceedings, alleging overwhelming pretrial publicity in Campbell County would make it impossible to receive a fair trial there. An appendix to the motion contained copies of twelve local newspaper articles covering the murder and the assault on a peace officer charges and a copy of that portion of the transcript of Nixon's change of plea hearing containing the trial judge's concern about whether it would have been possible to seat a fair jury in Campbell County in the murder case.

The trial court denied Nixon's venue motion, stating it could not assume a prejudiced jury pool from newspaper accounts, but agreed to revisit the issue at the time of jury selection, "depending on the responses we get." At the close of *voir dire,* Nixon objected to the entire jury panel, claiming he could not have a fair trial in the community because of "overwhelming sentiment" against him. The trial court disagreed, and the trial proceeded.

The jury found Nixon guilty of assault on a peace officer. The trial court sentenced Nixon to a term of four to five years in prison and ordered him to pay $95 in restitution to the Division for Deputy Urman's medical bills. Nixon filed a timely notice of appeal.

## DISCUSSION

*Venue*

It is well settled law in Wyoming that we review challenges of change of venue decisions for an abuse of discretion. *Sides v.*

*State,* 963 P.2d 227, 231 (Wyo.1998). We will not interfere with a trial court's decision concerning venue unless it acted in a manner exceeding the bounds of reason under the circumstances. *Id.* The party moving for the change of venue "has the burden of showing 'prejudice so great that a fair trial cannot be obtained' and he must show 'actual prejudice in the minds of the jurors.'" *Id.* (quoting *Murry v. State,* 713 P.2d 202, 208 (Wyo. 1986)).

*Wyoming Law*

Criminal defendants in Wyoming have a constitutional right to a trial by an impartial jury. *See* Wyo. Const., art. 1, § 10. Wyoming's constitutional provision grants the right to trial "by an impartial jury of the county or district in which the offense is alleged to have been committed." Wyo. Const. art. 1, § 10. The legislative provision mirroring the constitution requires "[e]very criminal case shall be tried in the county in which the indictment or offense charged is found, except as otherwise provided by law." Wyo. Stat. Ann. § 1–7–102(a) (LEXIS 1999). Trial proceedings are transferred to another county "only if the court is satisfied that there exists within the county where the prosecution is pending so great a prejudice against the defendant that the defendant cannot obtain a fair and impartial trial in that county." W.R.Cr.P. 21(a).

■ This Court has adopted a two-part test for determining whether a change of venue should be granted after *voir dire* because of pre-trial publicity:

First, the nature and extent of the publicity must be considered; second, the difficulty or ease in selecting a jury must be considered along with the amount of prejudice which actually appears during *voir dire* examination.

*Sides,* 963 P.2d at 231 (quoting *Murry, ·* 713 P.2d at 208).

■ Regarding the first prong of the test, Nixon provided the district court with twelve newspaper articles from the local paper and a comment from the judge in the murder case concerning how difficult it would have been to find a jury, especially if it was a death penalty case. Contrary to Nixon's allegations, we do not find the coverage "sensational," "inflammatory," or "grossly prejudicial." The large majority of the reporting was based on factual information from papers filed with the court and concerned procedural aspects of the murder case. *See Amin v. State,* 811 P.2d 255, 258 (Wyo.1991). The twelve articles spanned a six-month time period. The last article was dated December 7, 1997, and his trial was not until April of 1998. *See id.* (timing of news reports is persuasive in decision to uphold denial of a change in venue motion). Upon review of the articles, we agree that the district court could not assume the jury panel was prejudiced based on the newspaper accounts. Neither the nature nor the extent of the news coverage justify overturning the trial court's decision to deny the motions for change of venue. *Id.*

■ In denying the motion for change of venue, the district court properly suggested the venue question could be revisited at the time of jury selection. In *Murray v. State,* 671 P.2d 320 (Wyo.1983), we held it is appropriate to delay a change of venue decision until the effect of the pretrial publicity can be determined at *voir dire. Id.* at 327.

Even where a juror may have formed or expressed an opinion as to the defendant's guilt from having read or heard news coverage, that juror may hear the case if the juror states, and the court is reasonably satisfied, that the juror can lay aside his opinion and render a verdict based only on the evidence presented in court. Wyo. Stat. § 7–11–106 (1997).

*Sides,* 963 P.2d at 231.

Of the fifty-eight potential jurors in the jury pool, twelve indicated they had formed an opinion of Nixon before the trial. These people were interviewed individually by the trial court and counsel. Nixon challenged five of those jurors for cause, and the trial court allowed all but two of his challenges. Those two potential jurors were removed from the jury panel by peremptory challenges, one by the defendant and one by the State.

Jurors not excused for cause convinced the trial court they were able to distinguish between the earlier crime and the case before them. Many had not heard anything about this particular case, and the trial court determined they were able to compartmentalize their feelings about the earlier crime and not assume Nixon was guilty in this instance. When Nixon objected to the entire panel because of the sentiment against him in the community, the trial court observed: "I've heard more intelligent and conscientious responses to questions today than I've heard in a long time, so the Court disagrees, believes that these folks are willing to serve and can, many of them."

*Voir dire* examination of the potential jurors satisfied the trial court that the jurors could set aside their opinions and render a fair verdict based on the evidence. We have held:

> [J]uror exposure to publicity about a criminal case is to be anticipated and, indeed, jurors may even have formed an opinion as to the guilt of the accused, which by itself, is not a ground for requiring a change of venue. The test is whether a juror can lay aside his opinion and render a verdict based on the evidence.

*Amin*, 811 P.2d at 258. There was not "so great a prejudice against the defendant that the defendant [could] not obtain a fair and impartial trial in that county." W.R.Cr.P. 21(a).

### Federal Due Process

■ Nixon relies on *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), and *Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), to argue extensive pretrial publicity in this case violated his constitutional right to due process because he did not have an impartial jury. The Sixth Amendment right to a fair trial is made applicable to the states by the Fourteenth Amendment. Nixon's reliance on *Sheppard* and *Rideau* is misplaced. *Murphy v. Florida*, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975), is more pertinent to the facts in this case. *Murphy* distinguished its facts from *Sheppard* and *Rideau* and refused to presume prejudice based on pre-

trial publicity. *Id.* at 798–803, 95 S.Ct. at 2035–38.

In *Rideau* the defendant had "confessed" under police interrogation to the murder of which he stood convicted. A 20–minute film of his confession was broadcast three times by a television station in the community where the crime and the trial took place. In reversing, the Court did not examine the *voir dire* for evidence of actual prejudice because it considered the trial under review "but a hollow formality"—the real trial had occurred when tens of thousands of people, in a community of 150,000, had seen and heard the defendant admit his guilt before the cameras.

* * *.

Similarly, *Sheppard* arose from a trial infected not only by a background of extremely inflammatory publicity but also by a courthouse given over to accommodate the public appetite for carnival. The proceedings in these cases were entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of a mob. They cannot be made to stand for the proposition that juror exposure to information about a state defendant's prior convictions or to news accounts of the crime with which he is charged alone presumptively deprives the defendant of due process. To resolve this case, we must turn, therefore, to any indications in the totality of circumstances that petitioner's trial was not fundamentally fair.

*Id.* at 799, 95 S.Ct. at 2035–36.

*Murphy* considered several factors in determining whether the defendant received a fair trial. Those factors included: (1) whether the jurors who served in the trial were so hostile that partiality could not be laid aside; (2) whether the jurors could compartmentalize the two cases, understanding that past crimes are irrelevant to the present case; (3) whether the atmosphere of the community or courtroom suggests a sentiment so tainted that assurances of impartiality must be drawn into question—this includes consideration of the recency of the news coverage and whether the reports were largely factual

in nature or merely inflammatory; and (4) whether the trial court's inquiry was sufficient to evaluate assurances of impartiality considering the number of persons excused for cause. *Id.* at 798–803, 95 S.Ct. at 2035–38.

Our analysis of this case under Wyoming law considered these same factors. The jurors who served were not hostile and were able to lay aside their opinions of Nixon; they understood the murder case was irrelevant to the present case and could not be used against him; the news coverage was mainly factual and sufficiently predated the trial; the trial court allowed extensive individual *voir dire* of the twelve potential jurors who had an opinion of Nixon; only five were challenged for cause, and trial court only denied two of those challenges. Viewing "the totality of [the] circumstances," there is no indication the jury was biased. Therefore, the trial court did not err when it refused to transfer venue to another county.

*Sufficiency of the Evidence*

 Nixon contends the State's evidence was insufficient to prove he intended to injure Deputy Urman. He claims the evidence, even viewed in the light most favorable to the State, demonstrates he intended to hug his mother and not to assault and injure Deputy Urman. When faced with a sufficiency of the evidence appeal, we view the evidence and appropriate inferences in the light most favorable to the State. *Jennings v. State*, 806 P.2d 1299, 1302 (Wyo. 1991). Our duty is not to substitute our judgment for that of the jury; rather, we determine whether a quorum of reasonable and rational individuals would, or even could, have found the essential elements of the crime were proven beyond a reasonable doubt. *Id.; Urrutia v. State*, 924 P.2d 965, 967 (Wyo.1996).

Nixon was charged with felony assault on a peace officer in violation of Wyo. Stat. Ann. § 6–5–204(b) (LEXIS 1999), which provides:

> (b) A person who intentionally and knowingly causes or attempts to cause bodily injury to a peace officer engaged in the lawful performance of his official duties

is guilty of a felony punishable by imprisonment for not more than ten (10) years.

At the close of evidence, the trial court instructed the jury that before it could convict Nixon of assault on a peace officer, it must find beyond a reasonable doubt that Nixon had intentionally and knowingly caused or attempted to cause bodily injury to a peace officer engaged in the lawful performance of his official duties. Nixon only disputes the finding that he intended to injure Deputy Urman.

There was a heightened demand for security at the sentencing hearing because of the nature of the crime and the emotional community response. Nixon became agitated during the hearing, triggering concerns of potential security risks and the decision to escort him from the courtroom immediately following the hearing. After the judge sentenced him to life in prison and left the courtroom, Nixon stood up and turned toward his family. Deputy Urman, the officer closest to Nixon during the hearing, stepped between Nixon and his family, placed his hand on Nixon's shoulder and ordered him to leave the courtroom. Nixon batted Deputy Urman's arm away and shoved him with both hands. Deputy Urman grabbed Nixon to control him. Another officer, Sergeant Seaman, came to Deputy Urman's aid and all three fell to the floor. During the struggle, Deputy Urman suffered rug burns on his wrist and strained muscles and tendons in his shoulder.

Nixon asserts that, because his only intent was to hug his mother at the conclusion of the hearing, the jury could not reasonably find he intended to injure Deputy Urman. Although Nixon's original intent may have been to hug his mother, once the officers blocked his path and directed him to leave the courtroom that intent was not going to be realized. He lashed out at Deputy Urman, swatting his arm away, pushing him, swinging at him, and finally wrestling with Deputy Urman and Sergeant Seaman until threatened with pepper spray.

Once Nixon was told to leave the courtroom, his original intent was irrelevant. Surely Nixon would not suggest that if an officer is shot and killed during an escape

attempt, the killer could only be charged with escape and not murder because the killer's original intent was to escape. Yet, his argument uses the same logic. The evidence at trial was sufficient to uphold the jury's finding that his intentional acts injured Deputy Urman after he recognized he would not be allowed to hug his mother. Indeed, it is the only reasonable interpretation to be drawn from the record.

### Restitution

 Nixon contends the court's order to pay $95 to the Division is not authorized under the restitution statute. In ordering restitution, the trial court's exercise of discretion is circumscribed by the statutes authorizing restitution. *Aldridge v. State,* 956 P.2d 341, 343 (Wyo.1998). Whether the restitution statutes authorize payment to the Division is a question of law, which we review *de novo. Witt v. State,* 892 P.2d 132, 137 (Wyo.1995). If the trial court's conclusion is in accordance with law, it is affirmed. *Id.* (citing *Parker Land & Cattle Co. v. Wyoming Game & Fish Comm'n,* 845 P.2d 1040, 1042 (Wyo.1993)).

Wyo. Stat. Ann. § 7–9–102 (LEXIS 1999) directs the sentencing court to order payment of restitution to each victim. "Victim" is defined in Wyo. Stat. Ann. § 7–9–101(a)(v) (LEXIS 1999):

> (v) "Victim" means a person who has suffered pecuniary damage as a result of a defendant's criminal activities. An insurer which paid any part of a victim's pecuniary damages shall be regarded as the victim only if the insurer has no right of subrogation and the insured has no duty to pay the proceeds of restitution to the insurer.

 Nixon contends the Division does not qualify as a victim under the restitution statute because it is an insurer with a right of subrogation. Nixon's argument focuses on whether the Division has a right of subrogation. We agree that Wyo. Stat. Ann. § 27–14–105 (LEXIS 1999) allows subrogation. However, that still leaves the question of whether the Division is an "insurer."

 The restitution statute does not define "insurer." Looking to the logical source for a definition, we turn to the Wyoming Insurance Code which defines "insurer" as "any person engaged as indemnitor, surety or contractor in the business of entering into contracts of insurance or annuity" and defines insurance as a contract. Wyo. Stat. Ann. § 26–1–102(a)(xvi), (xv) (LEXIS 1999). The Division is not in the business of entering into contracts of insurance or annuity and does not enter into contracts with employees or employers for insurance. The Insurance Code does not purport to govern the workers' compensation system. Further, the Division was required to pay Deputy Urman's medical expenses which resulted from Nixon's assault. It would be against public policy to allow a criminal defendant to avoid responsibility for damages he caused merely because the injured party was acting within the scope of his employment. Therefore, we hold the Division is not an insurer for purposes of the restitution statute, and the trial court's order is affirmed.

### CONCLUSION

We are convinced the trial court ensured Nixon received a fair trial before impartial jurors. The evidence was sufficient to permit a rational jury to find Nixon intended the actions which caused injury to Deputy Urman. For purposes of the restitution statute, the Workers' Compensation Division qualifies as a victim because it is not an insurer. We affirm the judgment and sentence in all respects.