2004 WY 57

**Rodney Lorenzo BROWN, Appellant (Defendant),**

**v.**

**The STATE of Wyoming, Appellee (Plaintiff).**

**No. 02-257.**

Supreme Court of Wyoming.

May 18, 2004.

Representing Appellant: Kenneth M. Koski, State Public Defender; Donna D. Domonkos, Appellate Counsel; and Ryan R. Roden, Senior Assistant Appellate Counsel.

Representing Appellee: Patrick J. Crank, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; and Vicci M. Colgan, Senior Assistant Attorney General.

Before HILL, C.J., and GOLDEN, LEHMAN, KITE, and VOIGT, JJ.

VOIGT, Justice.

[¶ 1] In June 2002, a Natrona County jury found the appellant, Rodney Lorenzo Brown, guilty of felony larceny, a violation of Wyo. Stat. Ann. § 6–3–402(a) and (c)(i) (LexisNexis 2003), and misdemeanor possession of marijuana, a violation of Wyo. Stat. Ann. § 35–7–1031(c) (LexisNexis 2003). On appeal, the appellant contends that the evidence was insufficient to sustain his felony larceny conviction, that several witnesses testified to matters for which they had no personal knowledge and their testimony was speculative, irrelevant, and prejudicial, and that his trial counsel was ineffective in not objecting to this witness testimony. We affirm.

## ISSUES

1. Was the evidence presented at trial insufficient to support appellant's grand larceny conviction?

2. Did plain error occur at trial when two State witnesses testified as to their impressions, opinions and beliefs of what occurred on the videotape, thereby invading the province of the jury, and when another State witness testified to matters of which she had no personal knowledge?

3. Did defense counsel render ineffective assistance of counsel in failing to object to testimony at trial?

## FACTS

[¶ 2] On the morning of January 7, 2002, Ayres Jewelers' employee Dawn Miller (Miller) placed a necklace and attached tanzanite pendant (necklace) in a display case near the store's front door, and closed the display case.[1] The necklace, with a retail value of $3,700.00, was mounted on a bust. Miller positioned the bust in the display case so that it faced toward the street outside the front of the store (the case was situated so it could be viewed from the sidewalk outside the store). The display case had two sliding glass doors, which doors were not locked. Miller centered the bust on the right side of the display case (as one faces the case from inside the store), closest to the right-hand sliding glass door. According to Miller, the right-hand sliding glass door could be opened easily "without pressing your fingers against it," it "slides very easily." Dan Halferty, the store manager, added that the right-hand sliding glass door could be "opened with a shoulder or elbow. . . ." [2]

[¶ 3] Mary Ann Stratton (Stratton), another store employee, went to lunch at 12:00 p.m. on January 7th. Miller had no reason to believe that the bust had been disturbed prior to noon January 7th, nor was she aware of anyone that expressed a particular interest in the necklace that day. According to Miller, employees customarily "look at everything" when they leave; "we're so familiar with the items that, for a case to be opened slightly or something slightly out of line from the way we set it out, it's [immediately] noticeable." Halferty similarly testified to his, and the employees', customary practices:

> A. Anytime that we walk by a display case, . . . it's common practice to check to see what things look like, to see where they are, just to make sure the subjects haven't been moved or tipped over, that it's in full view of everybody's vision, especially of the street; because that's some-

1. According to the store manager, store employees customarily put the jewelry in the display cases before 9:00 a.m., "before we open the store to the general public."

2. Officer Patrick Carr, a patrol officer and evidence technician for the Casper Police Department, later discovered partial latent fingerprints on the glass display case and a partial latent fingerprint on the bust. The fingerprints recovered from the display case did not match the appellant's fingerprints, but could have come from a customer or store clerk. In Carr's opinion, someone could access the display case without leaving a fingerprint.

thing that we can't see specifically from in the store, because all of the merchandise faces outward. So if you were to walk up and look at the case from the back, hence, again, you wouldn't see anything; there's nothing there to look at; it all faces towards the street.

Q. And again, when you return from lunch, is it the habit of the employees to check the condition of those cases?

A. Yes.

[¶ 4] Miller recalled a "fairly good lunch rush" January 7th. A "man of color" (later identified as the appellant) and a woman entered the store between 12:35 p.m. and 12:40 p.m., while Miller was assisting another customer. The man "stayed down [front] by the door" most of the time, while the woman came further into the store and began looking through cases. Miller noticed the man "wandering around a little bit by the door" and the woman said she was "just looking." They ultimately left separately, without making a purchase. Halferty testified that, based on a videotape obtained from the store's security system, the man and the woman were in the store less than two minutes.

[¶ 5] Stratton returned to the store about 12:55 p.m. and, according to Miller, Stratton noticed that the front display case's right-hand sliding glass door was open and the bust was turned, with no necklace. Miller also observed firsthand that the bust was turned. The security system videotape shows that by 1:05 p.m., two or three store employees were conferencing and by 1:25 p.m., it was "plainly obvious" that the employees had begun searching for the missing necklace.

[¶ 6] Ann Bartels, the appellant's wife at the time, testified that on January 7th, she accompanied the appellant to Ayres Jewelers to look at wedding rings. According to Bartels, the appellant wore jeans, a gray sweatshirt, and a leather coat. He usually also wore a Saints football team hat. The two left the store and decided to drive to another location for lunch. On the way, Bartels observed an inch of gold chain in the appellant's pocket. That made Bartels angry because if the appellant "took something from a jewelry store, that wasn't right."

[¶ 7] Bartels recalled telling a detective that the chain she observed in the appellant's pocket looked like the same chain that was depicted in a photograph the detective showed her, but testified that she could not say the two were one and the same because she did not see the whole necklace or the whole chain that was in the appellant's pocket. She also claimed that the detective "kept trying to tell me that he wanted me to say that I knew that that was the necklace for sure." Casper Police Department Detective Derrick Dietz (Dietz) testified that he showed Bartels a photograph of the stolen necklace, and Bartels stated that the chain in the photograph looked "very similar" to what she had observed in the appellant's pocket, and with respect to the distinctive herringbone design of the stolen necklace, Bartels stated that it was the "right design, and the basic size of this chain would be what she had seen."

[¶ 8] Based on information obtained from Bartels and the jewelry store's security system videotape, Dietz was able to identify specific clothing that the appellant was wearing the day of the theft, including a Saints hat, a gray hooded sweater-type jacket or shirt with blue stripes down the arms, and a dark coat. While executing a search warrant in the appellant's bedroom, Dietz discovered a Saints hat, a gray hooded sweater with blue stripes down the arms, and several dark jackets. The officer never located the stolen necklace. Dietz then interviewed the appellant, who denied any involvement in the theft and denied being at the jewelry store January 7th. When confronted with pictures obtained from the store's security system videotape, the appellant admitted to having been in the jewelry store, but otherwise denied involvement in the theft.

[¶ 9] The appellant chose to testify at trial. He testified that Bartels lost her wedding ring, so the two were looking at wedding rings on January 7th. Upon entering the Ayres Jewelers store, Bartels went to the counter. The appellant accompanied her for a brief minute but when no one helped them, he "milled around up at the front" of the

store. The appellant stated that he saw the necklace at issue in one of the display cases near the front of the store. He was interested in the ring next to the necklace and tried to get Bartels to come and look, but Bartels was "doing her own thing."

[¶ 10] According to the appellant, the two left the store to "go eat" and, while the appellant was driving to that location, he pulled a gold chain with a ring on it out of his pocket and showed it to Bartels, stating "Ann, look at this." The appellant testified that the chain was one that a former girlfriend had given him, and he was just "goofing off" because Bartels was "high strung" and he wanted to "get a rise out of her." The officers never located a gold chain containing a ring during their search of the appellant's residence, or his person. The appellant denied stealing the necklace from the jewelry store and characterized his relationship with Bartels as "rocky" at the time she spoke to the police about what she observed in the appellant's pocket. The two had apparently divorced by April 2002.

[¶ 11] The appellant ultimately was charged in an Amended Information with larceny, a felony, in violation of Wyo. Stat. Ann. § 6-3-402(a) and (c)(i), and possession of marijuana, a misdemeanor, in violation of Wyo. Stat. Ann. § 35-7-1031(c).[3] On June 4, 2002, a jury found the appellant guilty of both offenses. The district court sentenced the appellant to concurrent terms of imprisonment for four to eight years on the larceny conviction and ninety days on the possession of marijuana conviction, and to pay restitution and other fees. The appellant appeals from the district court's judgment and sentence; however, the appellant does not raise any appellate issues concerning his possession of marijuana conviction.

## DISCUSSION

### *Sufficiency Of The Evidence*

[¶ 12] The appellant first argues that the evidence was insufficient to sustain his felony larceny conviction. We have said that, when

> reviewing an appeal based on sufficiency of the evidence, we view the evidence, and any applicable inferences based on the evidence, in a light most favorable to the State. *Nixon v. State,* 994 P.2d 324, 329 (Wyo.1999); and *see Pool v. State,* 2001 WY 8, 17 P.3d 1285 (Wyo.2001). In conducting such a review, we do not substitute our judgment for that of the jury; rather, we determine whether a quorum of reasonable and rational individuals would, or even could, have found the essential elements of the crime were proven beyond a reasonable doubt. *Id.*

*McFarlane v. State,* 2001 WY 10, ¶ 4, 17 P.3d 31, 32 (Wyo.2001). Even though it is possible to draw other inferences from the evidence presented, the jury has the responsibility to resolve conflicts in the evidence, and when reviewing the evidence on appeal, we do not consider conflicting evidence presented by the unsuccessful party. *Allen v. State,* 2002 WY 48, ¶ 58, 43 P.3d 551, 570 (Wyo.), *cert. denied,* 537 U.S. 899, 123 S.Ct. 201, 154 L.Ed.2d 170 (2002); *Williams v. State,* 986 P.2d 855, 857 (Wyo.1999).

[¶ 13] The jury found the appellant guilty of felony larceny. Wyo. Stat. Ann. § 6-3-402 provides, in pertinent part:

> (a) A person who steals, takes and carries, leads or drives away property of another with intent to deprive the owner or lawful possessor is guilty of larceny.
>
> . . .
>
> (c) Except as provided by subsection (e) of this section, larceny is:
>
> (i) A felony punishable by imprisonment for not more than ten (10) years, a fine of not more than ten thousand dollars ($10,000.00), or both, if the value of the property is five hundred dollars ($500.00) or more; . . . [.]

The district court instructed the jury as follows regarding the elements of felony larceny:

3. While searching the appellant's bedroom, officers discovered an Altoids tin containing marijuana.

YOU[ ] ARE INSTRUCTED that the elements of the crime of Larceny, as charged in Count I, of this case, are:

1. On or about the 7th day of January, 2002
2. In Natrona County, Wyoming
3. The Defendant, Rodney Lorenzo Brown
4. Stole, took and carried, led or drove away
5. Property of another of the value of $500.00 or more
6. With intent to deprive the owner or lawful possessor.

The only element at issue on appeal is whether it was the appellant who stole, took and carried, led or drove away the necklace.[4]

[¶ 14] We find that the evidence and the reasonable inferences that may be drawn from it, when viewed in a light most favorable to the State, was sufficient for a rational jury to conclude beyond a reasonable doubt that the appellant stole the necklace. In a larceny case, the " '[o]pportunity to commit the crime, ... when linked with other incriminating facts, may establish the guilt of the defendant.' " *Fischer v. State,* 811 P.2d 5, 7–8 (Wyo.1991) (*quoting Wells v. State,* 613 P.2d 201, 203 (Wyo.1980)); *see also McGarvey v. State,* 2002 WY 149, ¶ 16, 55 P.3d 703, 706 (Wyo.2002) and *Downs v. State,* 581 P.2d 610, 616 (Wyo.1978) (burglary cases). Likewise, the possession of recently stolen property " 'is a strong circumstance tending to show guilt and only slight corroborative evidence of other inculpatory circumstances is required.' " *Downs,* 581 P.2d at 615 (*quoting Newell v. State,* 548 P.2d 8, 13 (Wyo.1976)).[5]

[¶ 15] The morning of January 7th, Miller placed the necklace (mounted on a bust) in a display case near the front door of the store; the item was placed on the right side of the display case nearest the right-hand sliding glass door, which door was unlocked and easily slid open. She positioned the bust so that it was facing the street outside the store. Later that day, the appellant testified that he and Bartels went to Ayres Jewelers to look at wedding rings. Miller estimated that the two arrived at the store between 12:35 p.m. and 12:40 p.m. The store's security system videotape (when adjusted to the actual time of day)[6] confirms this, indicating that the two entered the store around 12:42:53 p.m.

[¶ 16] According to Miller, the appellant stayed down front by the door most of the time. Importantly, the appellant himself testified that he "milled around" at the front of the store and in fact saw the necklace at issue in a display case near the front of the store because he was interested in the ring next to the necklace. At about 12:43:41 p.m., the appellant appears on the videotape to move within twenty-eight inches of the display case's glass. At about 12:44:56 p.m. on the videotape, just over two minutes after entering the store, the appellant and Bartels have left the store. Miller testified that they left separately.

[¶ 17] Almost immediately thereafter, while the appellant and Bartels were driving to another location, Bartels observed an inch of gold chain in the appellant's pocket. The appellant testified that he pulled a gold chain from his pocket and stated "Ann, look at this." When Dietz showed Bartels a photograph of the stolen necklace, Bartels stated that it looked like the same chain she observed in the appellant's pocket, but she hadn't seen the whole necklace or chain at the time. According to Dietz, Bartels stated that the chain she observed on the appellant's person was "very similar" to the pictured stolen necklace, and was the "right [herringbone] design" and "basic size" of the distinctive, pictured jewelry. The comparison was such that, as Bartels testified, she

4. At trial, the appellant conceded that someone had stolen the necklace.

5. While *Downs* was a burglary case, we have also discussed this principle in larceny cases. *See McFarlane,* 2001 WY 10, ¶¶ 9–11, 17 P.3d at 33–34; *Mendicoa v. State,* 771 P.2d 1240, 1243–45 (Wyo.1989); and *State v. Costin,* 46 Wyo. 463, 28 P.2d 782, 783 (1934).

6. The time that actually appears on the videotape is approximately an "hour off." For example, if the time appears on the videotape as 1:42:53, the actual time of day is 12:42:53. We will refer to the actual time of day in this opinion.

became "angry" because she suspected that the appellant may have stolen the chain from the jewelry store.

[¶ 18] At approximately 12:55 p.m., Stratton returned from lunch and noticed that the front display case's right-hand sliding glass door was open, and the bust was "turned, with no necklace." There is no evidence on the security system videotape, or in the record as a whole, indicating that anyone other than the appellant went near this particular display case between 12:43:41 p.m. and 12:55 p.m.

[¶ 19] The appellant's argument on this issue essentially details the testimony of Miller, Halferty, Dietz, Bartels, and Officer Carr, while advocating the appellant's own view of that testimony and what particular inferences could and should be drawn from it.[7] However, the applicable standard of appellate review mandates a contrary approach; the evidence, and the reasonable inferences based on it, are to be viewed in a light most favorable to the State. We also note that a considerable portion of the appellant's argument is devoted to Halferty's and Dietz's testimony characterizing certain "shadows" on the security system videotape (an issue we will discuss in the next section of this opinion). We did not consider this disputed testimony in evaluating whether the evidence was sufficient to sustain the appellant's felony larceny conviction, and find that the evidence clearly was sufficient even in the absence of such testimony.

### *Witness Testimony*

[¶ 20] The appellant next argues that portions of testimony by Halferty, Dietz, and Miller constituted plain error. The appellant's trial counsel did not object to any of the challenged testimony at trial. On appeal, it is therefore incumbent upon the appellant to demonstrate plain error in that "the record clearly shows an error that transgressed a clear and unequivocal rule of law which adversely affected a substantial right." *Compton v. State,* 931 P.2d 936, 939 (Wyo. 1997).

[¶ 21] The appellant first contends that Halferty and Dietz erroneously testified to their "impressions, opinions and beliefs ... formed from watching the security camera's videotape," which testimony was not based on the witnesses' personal knowledge and as a result was speculative, misleading, irrelevant, and prejudicial in violation of W.R.E 401, 402, 403, 602, and 701.[8] The

7. In doing so, the appellant omits or glosses over key portions of his own testimony and that of Bartels. For example, in assessing the evidence, the appellant repeatedly relies on testimony that Margaret Ayres initially reported that the theft occurred between 10:00 a.m. and 1:20 p.m. January 7th. The appellant conveniently ignores his own testimony that the necklace and pendant were present in the front display case while he was in the store. The appellant also states that "no evidence established that Mr. Brown was ever in possession of the necklace," which statement ignores the testimony as to what Bartels observed in the appellant's pocket shortly after leaving the jewelry store.

8. W.R.E. 401 states:

"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

W.R.E. 402 states:

All relevant evidence is admissible, except as otherwise provided by statute, by these rules, or by other rules prescribed by the Supreme Court. Evidence which is not relevant is not admissible.

W.R.E. 403 states:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

W.R.E. 602 states:

A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the testimony of the witness himself. This rule is subject to the provisions of Rule 703, relating to opinion testimony by expert witnesses.

W.R.E. 701 states:

If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

W.R.E. 701 essentially incorporates the personal knowledge requirement of W.R.E. 602. *Schmunk v. State,* 714 P.2d 724, 734–35 (Wyo. 1986).

appellant's argument focuses specifically on testimony: (1) by Halferty, prior to the videotape's admission as a trial exhibit, that while an individual (later identified as the appellant) is in the vicinity of the display case containing the necklace, it "appears that there could very well be an arm over the neck that the [necklace] is on" and that the "stand that the [necklace] is on has [then] been turned about 90 degrees"; and (2) by Dietz, while playing the security system videotape for the jury, that a "shadow" appearing on the tape while the appellant is within twenty-eight inches of the display case is an "arm shadow" and that later on the tape the bust display had been "changed."

[¶ 22] The record is clear regarding what occurred at trial. The store's security system included four fixed video cameras, at least one of which showed images within twenty-eight inches of the front display case containing the necklace at issue. In recording images from the four video cameras onto a videotape, the security system cycled through each camera approximately every six to seven seconds and slowed the videotape in order to compress a long period of time onto a single tape. Due to the resulting "speed problems," the tape apparently must be "frame advanced" rather than simply playing the tape.

[¶ 23] Halferty, the jewelry store manager, had been employed by Ayres Jewelers for over two years.[9] Halferty was not in the store January 7, 2002, but was familiar with the stolen necklace, its value, the store's layout, the store's security system and procedures, and the identities of other customers appearing on the security system videotape. He viewed the videotape with Dietz on January 9, 2002. The disputed testimony follows:

> [Prosecutor:] How were you able to identify this one individual as being the person who had taken the item?
>
> A. From the amount of time that was spent at the forward entry area of the store.
>
> Q. Okay. And as you watch that person during that time period, did you notice any activity associated with the display case?
>
> . . .
>
> A. Okay. What had appeared to happen was that an individual walked towards the front of the store where the display case is; appeared to concentrate an interest in the lower right-hand side of that case as well as the center of the case. The tanzanite piece was just off center, towards the right as you face toward the street, which would allow it to be in full reach if you were to slide that door open maybe six or eight inches. There's a point when we were reviewing the tape that there appears that there could very well be an arm over the neck that the neck piece is on. There's a brief delay there. And then the next succession, in the shadows, shows that the actual neck piece and—or the stand that the neck piece is on has been turned about 90 degrees. I believe that neck piece was attached to—or the necklace itself was attached to the neck stand by two small wire bars which, if it was to be grabbed very quickly, would force that to turn. At that point, the same individual turned. All the subsequent photos, from that point on, appear that the—that the neck stand has been turned about 90 degrees and stays in that position for the remainder of the tape.
>
> Q. What do you use to base your conclusion that the neck stand was turned, or the bust was turned?
>
> A. The shadow, with the sun shining on the shadow, the neck stand, itself, has a width dimension which appears to be quite wide. And at the several seconds later, that same neck stand appears to be turned sideways and just very miniscule in its dimension.

[¶ 24] Dietz, a law enforcement officer for nearly fourteen years and a detective for over three years, had handled "[e]verything from arson to stealing bubble gum to homicide cases" and was assigned to investigate the instant case. It is evident from Dietz's testimony that he was familiar with the layout of the store (the scene of the crime) and the store's video security system. The security system videotape was

9. Halferty testified that he also had some law enforcement experience in that he used to "carry a federal commission and sheriff's office and a local badge."

admitted into evidence, without objection, during Dietz's testimony and a portion of the videotape (beginning when the appellant and Bartels entered the jewelry store and ending when they left the store) was played for the jury during the trial. On appeal, the appellant does not meaningfully question the admissibility of the security system videotape and its contents.[10] Dietz's testimony, in pertinent part, follows:

> [Prosecutor:] ... [I]s this the shadow we talked about?
>
> A. Yes. This is the bust in the display.
>
> ...
>
> Q. Watching this series of photographs, carefully, do you see Mr. Brown in the background?
>
> A. Yes.
>
> Q. What do you see him do?
>
> A. He steps right over to the opening part of the display, the side that you would get ahold of to slide it open.
>
> Q. And at 1:43:41 [12:43:41], again, what do we see in this picture?
>
> A. That's him getting closer. He's getting real close to that, within 28 inches of the glass.
>
> Q. Do you see what appears to be an arm or a hand anywhere?
>
> A. You see here in the shadow, the shadow going down towards the display piece. I can't differentiate if that's reaching at it or if that just happens to be where there's a movement being caught, opening the door, or what it is; but you can see an arm shadow.
>
> Q. What is he moving to as he moves towards the corner of the screen?
>
> A. Now he's moved, getting within that 28 inches. And you can see a shadow on the floor. So he's getting right up close to the—if this were the glass, he's getting right up close to it.
>
> Q. Again, can you see him by the case in the background here?
>
> A. Yes; still standing here.
>
> Q. Again, is that—from all of the angles, is that him by the case again, now completely underneath the camera?
>
> A. Yeah. You cannot see any part of him, just his shadowing on the floor.
>
> Q. And again, when we switch to the angle back to the store, is that still Mr. Brown at the case?
>
> A. Yeah. And now he appears to be kind of bladed to the camera, not so much face or back, but—but bladed to, open.
>
> ...
>
> Q. Now, we talked about shadows. And what's different about this now than when we earlier looked at it—when you and Mr. Halferty looked at the film?
>
> A. Even with—even with Rodney Brown still being—causing this shadow on the floor over here, you can see the change in this bust display right here. It used to be flat and more of a solid picture, like a face-on silhouette; and now you see it's been changed; it's been moved.
>
> ...
>
> Q. And that only occurred after Mr. Brown was near the case; is that true?
>
> A. Correct.

[¶ 25] The premise of the appellant's argument appears to be that neither Halferty, nor Dietz, was present at the jewelry store January 7, 2002, particularly during the events depicted on the videotape. While a " 'witness must have perceived firsthand the pertinent events or matters,' "[11] we note generally that other courts have, under certain circumstances, allowed witnesses with personal knowledge, but who were not pres-

10. At one point in his appellate discussion of this issue, the appellant does state in two sentences that the "shadows" portions of the videotape referenced by Halferty and Dietz "do not correctly portray the subject matter," "convey false, or at least unknown, impressions of what Mr. Brown did," and "had questionable value for admission of evidence purposes under W.R.E. 401[,] 402, and 403." These conclusory statements can hardly be deemed cogent argument.

11. *Schmunk,* 714 P.2d at 735 (*quoting* 3 Louisell and Mueller, Federal Evidence § 376 at 618–619). We have also said that we will "not limit the type of perceptions a witness must experience, especially given this court liberally construes W.R.E. 701 in favor of admitting opinion evidence of lay witnesses." *Wilks v. State,* 2002 WY 100, ¶ 25, 49 P.3d 975, 986 (Wyo.2002).

ent during the actual events depicted on a security system videotape, to express a lay opinion regarding the images contained on the videotape. *See, for example, United States v. Rivera-Maldonado,* 194 F.3d 224, 236–37 (1st Cir.1999); *United States v. Stormer,* 938 F.2d 759, 761–64 (7th Cir.1991); *United States v. Jackson,* 688 F.2d 1121, 1123–25 (7th Cir.1982), *cert. denied,* 460 U.S. 1043, 103 S.Ct. 1441, 75 L.Ed.2d 797 (1983); *United States v. Borrelli,* 621 F.2d 1092, 1095 (10th Cir.), *cert. denied,* 449 U.S. 956, 101 S.Ct. 365, 66 L.Ed.2d 222 (1980); *Robinson v. People,* 927 P.2d 381, 384 (Colo.1996) (collecting cases); and Brent G. Filbert, *Admissibility of Lay Witness Interpretation of Surveillance Photograph or Videotape,* 74 A.L.R. 5th 643 (1999) (collecting cases); and *generally United States v. Stanley,* 896 F.2d 450, 452 (10th Cir.1990) and Diane M. Allen, *Admissibility of Visual Recording of Event or Matter Giving Rise to Litigation or Prosecution,* 41 A.L.R.4th 812 (1985 and Supp. 2002) (collecting cases).

[¶ 26] Nevertheless, a protracted analysis is unnecessary because it remains the appellant's burden to demonstrate on appeal that, even if we were to assume that Halferty and/or Dietz offered some form of improper opinion testimony, such testimony denied the appellant a substantial right resulting in material prejudice. *Worcester v. State,* 2001 WY 82, ¶¶ 7, 11, 30 P.3d 47, 50, 51 (Wyo.2001). Material prejudice can be established by demonstrating a reasonable possibility that, in the absence of the challenged testimony, the verdict may have been more favorable to the appellant. *Id.,* 2001 WY 82, ¶ 12, 30 P.3d at 52.

[¶ 27] The appellant's argument as to material prejudice is quite conclusory. He merely declares that the referenced testimony dominated the mind of the jury (preventing it from making a rational determination of the truth), impermissibly invaded the province of the jury, and was misleading and unfair. Generally, an appellant "has to do more than conjecture about what the jury could have believed" and a "mere allegation of prejudice will not suffice to invoke the plain error rule." *Scheikofsky v. State,* 636 P.2d 1107, 1111 (Wyo.1981); *see also Worcester,* 2001 WY 82, ¶ 12, 30 P.3d at 52. Based on the following considerations, we find that the appellant has not established the requisite prejudice: (1) the evidence that the appellant stole the necklace was rather compelling, even in the absence of the testimony at issue;[12] (2) the actual security system videotape, including the portions Halferty and Dietz referred to during their "shadows" testimony, was ultimately played for the jury in open court and also admitted, without objection, into evidence as an exhibit (complete with instructions on how to play the videotape); (3) the appellant had an opportunity to cross-examine both witnesses; (4) the prosecutor emphasized the videotape's actual contents, and did not specifically reference the disputed testimony, during closing argument;[13] (5) the appellant testified that he saw the necklace and pendant in the display case when he was in the jewelry store and by 12:55 p.m., Stratton had discovered the necklace was missing and Miller saw firsthand that "the bust was turned"; and (6) the district court instructed the jury that in

> determining the weight to be given to an opinion expressed by a witness, you should consider the credibility of the witness, the extent of the witness's opportunity to perceive the matters upon which the opinion is based and the reasons, if any, given for it. You are not required to accept such an

12. That the evidence included circumstantial evidence is of no consequence because circumstantial evidence

> has the same qualities of persuasion accorded direct evidence. The law makes no distinction between direct and circumstantial evidence and only requires that the jury, before convicting a defendant, be satisfied of the defendant's guilt beyond a reasonable doubt from all the evidence in the case. Circumstantial evidence has both standing and stature.

*Wells,* 613 P.2d at 202; *see also Fischer,* 811 P.2d at 8.

13. The closest the prosecutor came to referencing the disputed testimony was in stating that "Halferty established that nobody else approached the case and handled the case, moved the bust, as what occurred when Rodney Brown was there."

opinion but should give it the weight to which you find it entitled.

[¶ 28] The appellant next argues that Halferty lacked the requisite personal knowledge to testify that "it was known that the bust had not been moved prior to Mr. Brown entering the store and that the necklace was in the case when Ms. Stratton went to lunch" because "the State did not put Ms. Stratton on the stand and therefore did not establish this fact." This characterization of Halferty's testimony does not accurately reflect Halferty's actual testimony (previously set forth herein) as to his, and the store employees', customary practices in inspecting the store merchandise. That aside, the testimony did not prejudice the appellant because the appellant testified that the necklace was present in the front display case while he was in the jewelry store (at some point after 12:42 p.m.).

[¶ 29] The appellant further argues that Dietz lacked the requisite personal knowledge to testify that "Mr. Brown was the only individual on the tape that had the opportunity to steal the necklace, ... [Dietz] not having viewed the entire tape from 9:00 a.m. until 1:20 p.m." Dietz testified that he was able to establish that "the necklace was still in the store prior to [Stratton] leaving the store to go to lunch," presumably based on his investigation, so he and Halferty viewed the tape beginning a "little bit before the noon hour" and proceeded to identify the individuals who appeared on the videotape. According to Dietz, only one segment of the tape had "people up in the area where the necklace was displayed." The following colloquy occurred during Dietz's testimony:

> [Prosecutor:] Could you identify any person who would have had the opportunity, directly at that case, to commit this theft?
>
> A. Yes.
>
> Q. How many people could you identify that had that opportunity?
>
> A. One.
>
> Q. And, in fact, have you reviewed this tape?
>
> A. Yes.
>
> ...
>
> Q.... So you and Mr. Halferty were able to narrow it down to this hour and this particular individual; is that true?
>
> A. Correct.
>
> ...
>
> [The appellant's trial attorney:] And these videotapes, you reviewed the entire day of tapes?
>
> A. No. There's sections well beyond the end and sections way in the beginning that we did not—we did not look at.
>
> Q. Those sections that you didn't view, is that before the store was open?
>
> A. I'm sorry?
>
> Q. The ones you didn't view, in the beginning, is that before the store was open?
>
> A. No. Actually, we didn't view from a time shortly before noon to earlier in the morning, because we knew that the necklace was there at that time. We were able to account for it up until the noon hour, when [Stratton] said she had seen it in the store window on her way out.
>
> ...
>
> Q. You did not view the tapes from 10:00 on?
>
> A. No, I did not.
>
> ...
>
> [Prosecutor:] Were some of the earlier portions of the tape run through by you and Mr. Halferty?
>
> A. Yes.
>
> Q. 10:00 to 12:00, there was a quick run-through; but there was nothing; is that right?
>
> A. That's correct.
>
> Q. You didn't do them in detail like you did the other parts, did you?
>
> A. No.
>
> Q. Did you see anything in that quick review that caused you any concern?
>
> A. No. You could see maybe a couple people coming in and out of the store, but nothing like this. They would all come back to the counter.
>
> Q. So when we talk about your review, there was a quicker review you did of

earlier in the morning, more detailed review later; is that correct?

A. Correct.

Q. I was misunderstanding you.

Did you see anything in the quick review that made you suspicious in any way?

A. No.

[¶ 30] The appellant's argument relies only on a selected portion of Dietz's testimony and ignores the detective's later attempt to clarify his testimony as to what portions of the videotape he reviewed and whether anyone else appeared to have an opportunity to steal the necklace. Further, the videotape was admitted into evidence as an exhibit, at the jury's disposal, and, as the prosecutor stated during his closing argument, the jury was free to "go through the whole film ... and confirm whether Mr. Halferty and Mr. Dietz were accurate when they told you that there was nobody else that was there."

[¶ 31] The appellant also asserts that portions of Miller's testimony were not properly based on her personal knowledge. The pertinent portions of Miller's testimony follow:

[Prosecutor:] Now, that day, after you put the [necklace] in the front case, did anybody express an interest in the item, that you're aware of, that day?

A. Not that I'm aware of.

Q. Do you have any reason to believe it had been disturbed in any way prior to lunchtime?

A. No.

...

Q. Is there a custom or habit of the employees of checking those front cases when they leave?

A. We look at everything when we're in there. We—we're so familiar with the items that, for a case to be opened slightly or something slightly out of line from the way we set it out, it's noticeable.

Q. Okay. Something you would notice immediately?

A. Yes.

This testimony was improper, according to the appellant, because: (1) Miller's awareness of customer interest in the necklace and pendant did not "definitely" mean that another customer had not in fact expressed an interest in the jewelry; (2) Miller's "belief" that the necklace and pendant had not been disturbed prior to lunchtime was not based on "definite facts and knowledge"; and (3) Miller did not testify that she or Stratton personally checked the front display case, or knew that any other employee did so, prior to the appellant's arrival at the store or immediately after his departure.

[¶ 32] Contrary to the appellant's argument, Miller's testimony was limited, by the phrasing of the questions asked, to her personal knowledge of the circumstances. The appellant's argument as to the extent of the potential inferences that might be based on that testimony pertains to the weight to be given the testimony, not Miller's personal knowledge. Further, the appellant has not established that this testimony materially prejudiced him. He asserts that the testimony "obviously" prejudiced him because it "was crucial to the State's case that the jury believe that the bust and necklace were undisturbed prior to [the appellant] entering the store...." Yet, this argument completely ignores the appellant's own testimony that the necklace was present in the front display case while he was in the jewelry store.

*Ineffective Assistance Of Counsel*

[¶ 33] The appellant merely summarizes his arguments on the previous issues and claims that his trial counsel was ineffective in not objecting to the above-referenced testimony by Halferty, Dietz, and Miller. Aside from the applicable standard of review, the appellant cites no pertinent legal authority in advancing this argument and again merely declares that he was "clearly prejudiced." We reject the appellant's argument for the reasons previously set forth in this opinion.

## CONCLUSION

[¶ 34] Finding no error sufficient to reverse the appellant's felony larceny conviction, we affirm.