2006 WY 131

**Julia B. WILLIAMS, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

**No. 05–185.**

Supreme Court of Wyoming.

Oct. 16, 2006.

sory after the fact to the unlawful killing of a human being.[1] She also contends that there was not sufficient evidence introduced during her trial so as to sustain her conviction for the crime of accessory after the fact to the unlawful killing. We will affirm the judgment and sentence of the district court.

Representing Appellant: Megan L. Hayes, Laramie, Wyoming; Donna D. Domonkos *, Appellate Counsel, and Ken Koski, Public Defender, Cheyenne, Wyoming. Argument by Ms. Hayes.

Representing Appellee: Patrick J. Crank, Wyoming Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; and Leda M. Pojman, Assistant Attorney General. Argument by Ms. Pojman.

Before VOIGT, C.J., and GOLDEN, HILL **, KITE, JJ., and STEBNER D.J, Retired.

HILL, Justice.

[¶ 1] Appellant, Julia Williams, contends that the district attorney's misconduct at trial constitutes plain error and that such error requires reversal of her conviction for acces-

* Order Granting Leave for Counsel to Withdraw entered September 15, 2005.

** Chief Justice at time of oral argument.

1. § 6–5–202. Accessory after the fact; penalties.

(a) A person is an accessory after the fact if, with intent to hinder, delay or prevent the discovery, detection, apprehension, prosecution, detention, conviction or punishment of another for the commission of a crime, he renders assistance to the person.
(b) An accessory after the fact commits:
(i) A felony punishable by imprisonment for not more than three (3) years, a fine of not more than three thousand dollars ($3,000.00), or both, if the crime is a felony and the person acting as an accessory is not a relative of the person committing the crime;
(ii) A misdemeanor punishable by imprisonment for not more than six (6) months, a fine of not more than seven hundred fifty dollars ($750.00), or both, if:
(A) The crime is a felony and the person acting as an accessory is a relative of the person committing the crime;
(B) The crime is a misdemeanor and the person acting as an accessory is not a relative of the person committing the crime; or
(C) The principal is a minor.

## ISSUES

[¶ 2] Williams raises these issues:

I. Whether plain error occurred when the prosecutor repeatedly referred to an inadmissible confession by Linda Greene and used information from that confession to bolster the State's theory of the case during trial and closing argument.

II. Whether there was sufficient evidence presented at trial to prove, beyond a reasonable doubt, that Linda Greene unlawfully killed Allen Ross, an essential element of the charged crime of accessory after the fact.

The State rephrases the issues more simply:

I. Did the prosecutor engage in misconduct?

(iii) No violation if the crime is a misdemeanor and the person acting as an accessory is a relative of the person committing the crime.
Wyo. Stat. § 6–5–202 (LexisNexis 2005).
§ 6–5–201. Definitions.
(a) As used in this article:
. . . .
(iii) "Relative" means a grandparent, grandchild, mother, father, husband, wife, sister, brother or child; and
(iv) "Render assistance" means to:
(A) Harbor or conceal the person;
(B) Warn the person of impending discovery or apprehension, excluding an official warning given in an effort to bring the person into compliance with the law;
(C) Provide the person with money, transportation, weapon, disguise or other thing to be used in avoiding discovery or apprehension;
(D) By force, intimidation or deception, obstruct anyone in the performance of any act which might aid in the discovery, detection, apprehension, prosecution, conviction or punishment of the person; or
(E) Conceal, destroy or alter any physical evidence that might aid in the discovery, detection, apprehension, prosecution, conviction or punishment of the person.
Wyo. Stat. Ann. § 6–5–201 (LexisNexis 2005).

II. Was there sufficient evidence to prove, beyond a reasonable doubt, that Linda Greene killed Allen Ross?

## FACTS AND PROCEEDINGS

[¶ 3] It is somewhat difficult to keep track of the persons involved in this factual scenario, and so we will provide a dramatis personae to aid both this Court and our readers in following the events that led up to the crime at issue here. Before we embark on that endeavor, we note that this group of people moved to Cheyenne in 1995 from Guthrie, Oklahoma. In mid 1995, Julia Williams purchased a house near downtown Cheyenne. It is also of some assistance in sorting out this rather unusual story to note that many of the main participants used various nicknames/aliases from time to time. The record is not crystal clear why, but it suggests that this was done at Linda Greene's urging because she believed various people were attempting to steal her business and because she was generally paranoid. It was the State's theory of this case that Linda Greene murdered Allen Ross, and Julia Williams assisted her in concealing that crime. It was Julia Williams's theory of the case that Denis Greene murdered Allen Ross and that she assisted Denis in concealing that crime, under threats of death made by him. However, ultimately Julia Williams decided not to testify in her own behalf. Rather, her theory of the case was presented to the jury in the form of the various statements, which were at once both exculpatory and inculpatory, that she made to the police.

[¶ 4] *Julia Williams* (hereinafter "Williams"): Williams was convicted of acting as an accessory after the fact after Linda Greene shot and killed Allen Ross on or about November 22, 1995. Williams helped Linda Greene drag Allen Ross's body from the main floor of the house to the basement, where the two of them interred his body in a shallow grave. Although the investigation into this case began in early 1996 and included a cursory search of the house where Allen Ross was buried, his body was not found until July 17, 2000.

[¶ 5] Williams and Linda Greene decided to move to Cheyenne in early 1995, and to that end Williams purchased a home near downtown Cheyenne. Williams, Linda Greene, and Allen Ross lived in that house and they also operated a business at that location called Amber Press. The main purpose of Amber press was to publish Linda Green's books on dowsing.[2] In addition, Williams bought an acreage near Loveland/Fort Collins, Colorado, where Williams intended to build a cabin.[3] She hired Denis Greene, Linda Greene's former husband, to build the cabin. It was of interest later in the case that Denis Greene, Williams, and Linda Greene were experienced at mixing and using cement and mortar. Williams's nickname was Celeste. Denis Greene sometimes posed as Jay Williams (and as Julia's brother). Linda Greene was also known as Genevieve. Allen Ross sometimes used the alias, Rex. In about October of 1995, Williams and Linda Greene began complaining that someone was trying to steal Amber Press's business (had expropriated its 800 number business). Williams also expressed a belief that Allen Ross, Mary Kett, and Laura Humphries were the thieves. Both Williams and Linda Greene believed that someone was trying to poison them.

[¶ 6] Williams provided a lot of "information" to the police in Cheyenne but very little, if any, of it was ever corroborated.

---

2. The gerund form of the word "dowse," which means "to use the divining rod (as in search of water or ore)." *Webster's Third New International Dictionary* 683 (1986). However, in Linda Greene's case the dowsing was in the nature of "spiritual dowsing." Denis Greene explained it this way: "And basically what they do is they— there are two things, one is where they hold a pendulum on a string and you hold it. You ask questions of the thing, and it's supposed to move." Furthermore, "[s]he would write whatever she wanted to figure out. So it's kind of like the truth or not the truth, or you can put a variety of questions or symbols. She kind of got into one branch of dowsing, a spiritually related subject, and they would—she took upon herself to dowse spiritual maladies [as opposed to the search for water]."

3. Although the jury never learned of this, Williams had apparently inherited a considerable sum of money (perhaps as much as $1,000,000.00) from her parents.

[¶ 7] *Allen Ross* (hereinafter "Ross"): He is the victim of the underlying crime. His body was found buried in a shallow grave in the crawl space of Williams's downtown Cheyenne home. The grave was covered with a thin layer of concrete, although his body was found because his feet were sticking out of the ground just a bit. Ross was a documentary film maker by trade, but also was involved romantically with Linda Greene and was associated with the operation of the Amber Press business. The parties stipulated that Ross had been "unlawfully killed." Eventually, the trial court also determined that a part of the State's burden of proof was to prove as an element of the crime that Linda Greene had killed Ross. Ross died of a single gunshot wound to the head.

[¶ 8] *Linda Greene Ross* (hereinafter "Greene"): Greene was the central person in this group. She was an expert in dowsing and attracted people to this group with her lectures, teaching, and books. Her former husband, Denis Greene, is also involved in this case. Greene was divorced from him in 1993. In the autumn of 1993, Greene and Ross became an item, so to speak, and soon after became at least "spiritual" spouses, although the record does not reflect that they were actually married. Because things became difficult for her group in Oklahoma, Greene decided that they should move to Cheyenne. Greene was ill at the time, although the exact nature of her illness is not a matter of record. Greene was committed for mental health treatment in late 1995 or early 1996. The record suggests that she suffered from paranoid schizophrenia or bipolar disorder. Greene died on March 18, 2002.

[¶ 9] One of the complications of presenting this case to the jury was that Denis Greene told the police that on November 25, 1995, Greene told him that she had killed Ross. However, on March 18, 2002, Greene died and was not available as a witness at trial. For that reason the district court ruled that no mention could be made of that statement, nor could any of the statements Greene made that tended to incriminate Williams be admitted as evidence. The district court's ruling was based in part on the United States Supreme Court's decision in the case, *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 1365–69, 158 L.Ed.2d 177 (2004), which held that the Confrontation Clause of the United States Constitution bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had a prior opportunity for cross-examination." Also see *Davis v. Washington,* — U.S. ——, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006) (further refining what the U.S. Supreme Court meant by "testimonial statements"). The trial court's decision to disallow the admission of many of Greene's statements was also based in part on *Lilly v. Virginia,* 527 U.S. 116, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999) (holding that admission of non-testifying accomplices' confessions violate the Confrontation Clause). The trial court's decision in this regard is in no way challenged in this appeal.

[¶ 10] *Denis Greene:* He is Greene's former husband and an associate of Ross and Williams. Much of the history of this case is told from his perspective because Greene died before this case came to trial, and Ross had been murdered. He met Greene when she worked as a nurse at a hospice where he also worked as a volunteer. In those days, Denis Greene worked as a consultant and fundraiser for non-profit organizations. He married Greene in 1984 and their son, Daniel Greene, was born on December 27, 1985. Greene became involved in dowsing in the late 1980's when the couple lived on a rural property between Edmond, Oklahoma, and Guthrie, Oklahoma. Denis Greene helped Greene form a nonprofit corporation called the Samaritan Foundation. He purchased an old jail building in Guthrie to house the activities of the Foundation. That building became known to this group as "the Monastery." Volunteers helped to renovate it and they also financially supported the Foundation. Denis Greene was skilled in the renovation and construction of buildings and often made his living doing that sort of work. Greene did a variety of workshops on dowsing and referred to the building as "the Monastery"—"because she envisioned it as the place where people come to learn what she was teaching." She thought of herself as a spiritual leader. There were several peo-

ple who would come to the Monastery and stay for extended periods of time. Among those people were Williams, Mary Kett, Laura Humphries, and Susan Kirchoff.

[¶ 11] In 1993, Greene told Denis Greene that she had multiple sclerosis (or some similar disease) and wanted a divorce so she could live "quietly in her final days." Denis Greene had custody of their son, Daniel Greene, after the divorce. Although they divorced, they remained in close contact so that their child would be able to visit his mother. In early 1995, Greene and Williams decided to move to Cheyenne and they asked Denis Greene to relocate there too. It was also Greene's and Williams's intent to purchase a parcel of 160 acres of undeveloped land near Loveland, Colorado, and build a cabin on it. Denis Greene lived in the Cheyenne house for a month or so, and then Williams purchased an RV trailer for Denis Greene and his son to live in on the Colorado land. Denis Greene's job was to build a cabin on that land and he set about that task in approximately June of 1995. Williams was going to repay Denis Greene for materials he bought to build the cabin and, to pay for his labor, she was going to deed 40 acres of the land to him as sort of a college fund for Daniel Greene. During this time period, Greene asked Denis Greene to go by the name, Jay Williams (a brother to Julia Williams). It was Denis Greene's impression that the regular group that used to hangout in Guthrie, Oklahoma, broke up about the time this move to Cheyenne was made. While construction was ongoing at the cabin site, Denis Greene would go to Cheyenne about once a month, and Greene and Williams would come to the site at least once a month. Denis Greene claimed that he got along well with Ross. He asserted that Williams did not get along well with Ross. Denis Greene denied that he had ever had a gun while he stayed at the Colorado property or that he had received a gun from Williams. Denis Greene also reported that Williams told him that it was necessary for her and Greene to go to St. Louis in October of 1995 in order to bring Ross back to Wyoming because he was having an affair with a fellow male worker. A couple of weeks later, they had to go to New Orleans to get Ross because he was having another affair there.

[¶ 12] On November 21, 1995, Denis Greene arrived in Cheyenne to do some work at Williams's house. He planned to stay over until the next day, November 22, 1995. Denis Greene's son Daniel Greene was already there visiting, and Ross, Greene, and Williams were there as well. Ross was helping Denis Greene with his project of working on a clutch. This work activity was being done in the basement of the Cheyenne house. While Ross and Denis Greene were working, Williams came down to the basement and told Ross that she and Greene were going to Guthrie to sell a rental house she owned there, as well as "the Monastery." Denis Greene reported that Ross became very concerned about that because he had a lot of valuable possessions stored there. Denis Greene surmised that Ross was planning to leave Cheyenne because Ross asked him for advice about what kind/size of vehicle to buy to haul his belongings and equipment. Denis Greene also claimed that Williams told him that Ross was planning to do something bad to Denis Greene and to his son Daniel Greene. Between 2:00 p.m. and 4:00 p.m. on November 22, 1995, Denis Greene left Cheyenne with his son and went back to Loveland. He stopped at a hardware store to buy some parts, stopped to get gas, and then arrived back at the cabin site around 6:00 p.m. Denis Greene testified that that was the last day he saw Ross alive.

[¶ 13] Greene and Williams next came to the cabin site on November 25–26, and 28, 1995. While there, Williams intimated to Denis Greene that Ross had left Cheyenne and had probably run off with his "gay lover," or was probably "on the beach getting a tan with Laura Humphries," and that she hoped he "is enjoying the money he stole from me." Initially, Denis Greene also presumed that Ross's disappearance/leaving was consistent with his concern about going to Guthrie to retrieve his belongings. Of course, it was during this visit that Greene told Denis Greene that she killed Ross, but Denis Greene did not really believe that at the time.

[¶ 14] In late November of 1995, county authorities in Colorado required Denis Greene to halt the building of the cabin because he did not have the proper permits. Also about that same time Williams and Greene moved from Cheyenne to Loveland and rented a house. Williams rented that house under the name Julia Hill. For a time Denis Greene and his son lived in the trailer in Loveland but when it got too cold, they moved to Kansas City, taking the RV trailer with them. Before he left for Kansas City, Denis Greene went to Cheyenne with Williams and helped her move a large copier and install a piece of peg board over the entrance to the crawl space of the Cheyenne house. Ross's body was eventually found in that crawl space.

[¶ 15] In the early part of 1996 Greene accused Denis Greene of killing Ross, and this set Denis Greene to wondering what actually had happened to Ross. Denis Greene's concern grew once he learned that Ross's family had not heard from Ross for several months and because of peculiar contacts he had with Williams and Greene. Eventually, Denis Greene gave a lengthy written statement to Cheyenne police about many of the events described in this recitation of the facts of this case. Williams never paid Denis Greene for the work he did or the materials he used to build the cabin. He filed a lien against the property, but then withdrew it because he feared Williams.

[¶ 16] *Daniel Greene:* As noted above, he is the son of Denis Greene and Linda Greene. He was nine years of age at the time Ross was murdered. However, he was present during many of the times crucial to the unraveling of this case and he recalled much of what he observed. When the group came to Cheyenne, Daniel Greene was given the "nickname" Sam but he quickly blew that by blurting out his real name. He testified that "the group was scared for my safety so they gave me fake glasses and a fake name." In later testimony, the "group" mainly turned out to be his mother. Like so much else about this case, exactly why Daniel Greene was not safe has no explanation based in fact. However, his candid testimony revealed a lot about this group, as did the district court's granting of a motion in limine that prohibited the prosecution from referring to the group as a "cult."

[¶ 17] Daniel Greene related that while he was at the cabin site, his mother pulled a 9–millimeter pistol out of her purse and shot the lock off an RV trailer. He testified that he saw her with a gun quite often and that she carried it in her purse. Daniel Greene never saw any other gun, except his mother's. Earlier testimony established that Williams purchased a Glock 9–millimeter pistol in the summer of 1995. He described the relationship between his mother and Williams this way: "... I saw [Greene] making all of the decisions and [Williams] was basically the financial center and basically just kind of back up my mom in whatever she said." He also testified that Williams and his mother were always together when he was with his mother. His observation was that Ross and his father got along very well and he never saw any disagreement between them.

[¶ 18] *Nelli Greene:* Denis Greene's girlfriend who eventually became his second wife. She and Denis Greene divorced about the time he and Daniel Greene returned to Kansas City at the end of 1995. Williams believed that Nelli Greene wanted to murder both Greene and her, which was all a part of the conspiracy against Amber Press. Also, Williams listed the fact that Ross had an affair with Nelli Greene as a reason Denis Greene had for wanting to kill Ross.

[¶ 19] *Helen Edwards:* Mrs. Edwards had no association with the persons described above, but she came to play a significant role in the unfolding of this story. She and her husband lived near the road that accessed the mountain property where Williams and Greene had Denis Greene building the cabin. She and her husband monitored the gate on the road to that property, and Mrs. Edwards kept a detailed journal of all the comings and goings from that property. Mrs. Edwards knew all of the people by their "nicknames," but of particular importance her journal revealed that Denis Greene had returned to the cabin at 6:06 p.m. on November 22, 1995.

## Narrative

[¶ 20] On March 7, 2003, an information was filed in the district court alleging that Greene murdered Ross on or about November 22, 1995. The information further alleged that Williams assisted Greene in concealing Ross's body in the basement of a downtown Cheyenne home. It suffices here to note that the pretrial proceedings were lengthy and the trial in this case did not begin until November 16, 2004. We will make further mention of the pretrial proceedings only to the extent that they bear on the issues raised in this appeal.

[¶ 21] Greene was a "spiritual leader" and founder of the Samaritan Foundation (also known as "the Monastery"), a nonprofit organization which Denis Green helped create. Williams met Greene at one of Greene's dowsing seminars in Oklahoma. In early 1995, Greene, Williams, and Ross moved from Oklahoma to Cheyenne. Williams purchased the home described above and the three of them lived in that home. In that home they also operated a business known as Amber Press, LLC. The purpose of that business was to write, publish, and sell books on dowsing. The books were authored by Greene.

[¶ 22] This case first got underway on February 21, 1996, when Denis Greene called a Cheyenne police detective and told him that a possible homicide had been committed in Cheyenne, and that the body of Ross was buried in the crawl space/basement of a downtown Cheyenne home. That detective also received some phone calls from members of Ross's family indicating that Ross was missing. The detective went to the house in question in March of 1996 to investigate. He did some digging in the crawl space but did not find Ross's corpse, although he did notice an area in the crawl space that was covered with concrete. The detective, and a second volunteer detective, spent 15–30 minutes looking around in the basement and then left. The detective did enter the name of Allen Ross into an NCIC missing persons data base.

[¶ 23] A second detective testified that Williams came to the Cheyenne police on June 25, 1999, "with some information that Mr. Ross had been found." That detective told Williams that Ross was still listed as a missing person. Williams also told the detective that a "psychic lady" had told her that Ross was buried in the city dump.

[¶ 24] Another detective testified that Williams called the police department on October 28, 1995, to report a burglary. However, Williams would not tell the detective the names of the people who lived there or allow him to otherwise investigate the scene (take fingerprints, etc.). Because Williams would not allow the investigation, that matter was not pursued further. On cross-examination, this detective also revealed that he had talked to Denis Greene about matters related to this case because he was at one time a suspect in the killing of Ross. The detective testified that Denis Greene denied having anything to do with the homicide.

[¶ 25] Yet another detective testified that on November 17, 1995, Williams called the police to report a disturbance (two people fighting) in her front yard. She told the police that the two people were Mary Kett and Laura Humphries. However, when the detective arrived, there was no one there and that was the end of the matter. The detective essentially did not believe Williams but told her she could call back if she needed further assistance.

[¶ 26] Still another detective was called to Williams's Cheyenne home on November 29, 1995. Williams complained that she had been the victim of an approximately $10,000.00 theft and expressed concern that there were people who wanted to harm her. She listed those people as Allen Ross, Laura Humphries, John MacArthur, and Mary Kett. Although this detective spent almost two hours at Williams's house, he could find no evidence that any crime had been committed. He also testified that Williams made no report about a dead body buried in the basement. Later testimony also revealed that Williams and Greene had made numerous other reports to the police about "suspicious activity" at or near their home in downtown Cheyenne.

[¶ 27] An expert from the Wyoming State Crime Laboratory testified that a shell cas-

ing found in the basement of Williams's Cheyenne home was possibly fired from a 9–millimeter Glock pistol.

[¶ 28] One of the State's principal witnesses was Dean Jackson. Jackson had more than 20 years of experience as a police detective and homicide investigator. In 1999 he became an investigator for the Laramie County District Attorney. He became involved in this case when he and a police detective found Ross's remains in July of 2000. In January of 2001, Jackson accompanied Detective Bilkie on a trip to New Orleans to interview Williams and Greene over the course of three days, January 27–29, 2001. On the first day of discussions with them, for almost seven hours they discussed the disappearance of Ross. On the second day, Jackson talked with Williams, while Bilkie talked with Greene. Tape recordings of portions of Williams's interviews were played for the jury; however, no transcripts were made of the tape recordings. Jackson had a detailed knowledge of the background for this case because he had studied records from the Cheyenne home, from the Guthrie, Oklahoma sites, from police reports, and statements from witnesses such as Denis Greene. Ross's bank records showed that the last check he ever wrote was on November 22, 1995. Jackson had also listened to a tape recording of a conversation between Ross and Greene that indicated there was a problem in that relationship.

[¶ 29] Of great significance to this case, on the third day of these interviews, Williams reported that she had learned from Greene in December of 1995 that Ross had been murdered. She also implicated Denis Greene in Ross's disappearance, as well as the conspiracy to steal from Amber Press. However, the information she revealed did not indicate that she had participated in the murder or its aftermath in any way. Most of what Greene had to say could not be related to the jury because the district court suppressed statements that she made which tended to incriminate Williams.

[¶ 30] On March 21, 2001, Greene and Williams came to Cheyenne. Each of them was interviewed at the Cheyenne Police Department on March 22. As was the case with other statements given by Greene, these were not called to the attention of the jury. Williams was also interviewed and she gave a statement that was consistent with what she had told the police when she was interviewed in New Orleans. The gist of that statement was that on or about November 22, 1995, Greene wanted Williams to go down to the basement where Ross and Denis Greene were working on repairing a transmission and tell Ross that they were going to Oklahoma to close up the properties in Guthrie. Williams said that by doing that, Greene hoped to provoke a reaction from Ross. He did react saying something to the effect that "please, no matter what you find, let me get my things." Greene then went to her room to watch TV and later they went to a hotel and later yet to separate hotels. Williams said nothing about Ross being shot or ever seeing his body but that all of his belongings were gone when they returned to the home the next day. Greene and Williams really had no intention of going to Oklahoma—all of it was a charade to provoke a reaction from Ross. When asked about her statement from the New Orleans interview that Denis Greene murdered Ross, she hedged and said she only "believed" he did it, not that she knew he did it. Also, while they were in Cheyenne, Jackson took both Williams and Greene on a walk-through of the downtown house. Jackson noted that neither had any visible response even when he took them down to the basement crawl space.

[¶ 31] After these interviews, Williams returned to New Orleans and continued to communicate with the Cheyenne Police Department by FAX. In each successive FAX her story about what happened with Ross and the conspiracy against Amber Press appeared to evolve. Indeed, eventually Williams came up with an astonishingly long list of motives that Denis Greene might have had for killing Ross. Jackson testified that the last check written by Ross was dated November 22, 1995. Ross dropped off a book order in September of 1995 but never picked it up. Furthermore, Ross dropped off his vehicle to be repaired on November 20, 1995, and never reclaimed it. Williams eventually picked up the book order. Detective

Jackson obtained Williams's credit card records and was able to track her travels over the time period from late 1995 through early 1997.

[¶ 32] On March 18, 2002, Williams called Detective Jackson to tell him that Greene had died and that she wanted to come to Cheyenne and talk to him. Williams had told Detective Jackson to look at Denis Greene, Susan Kirchoff, and Laura Humphries as persons of interest in Ross's disappearance. Jackson testified that he had eliminated Kirchoff and Humphries as suspects and indicated that he had no evidence linking Denis Greene with Ross's disappearance.

[¶ 33] Williams arrived in Cheyenne on March 20, 2002, and met Detective Jackson at his office. Her story changed yet again as she told Jackson that she was present in the Cheyenne home when the shots that killed Ross were fired. Williams was not sure what date the killing took place but that it was sometime between November 22, and 24, 1995. Two shots were fired. However, she only heard them, she did not see them being fired. Williams came downstairs and saw Denis Greene with the gun in his hand and Ross lying on the floor. Williams then helped Denis Greene carry Ross's body to the basement using sheets or blankets and helped clean up. She also related that Denis Greene directed her to conceal the gun that was used to shoot Ross, and she took it to Kansas City and put it behind a hotel. The police looked for that gun but could not find it.

[¶ 34] In her statement Williams did not account in any way for where Greene was when this occurred or for where Daniel Greene was when this occurred. She also related that Denis Greene said he shot Ross because Ross had sexually molested Daniel. She helped Denis Green inter Ross's body because she was afraid Denis was going to kill her. Williams originally stated she did not know what happened to the gun that Denis Greene used. In the summer of 2000, when Jackson indicated that they were looking in the basement of her Cheyenne home for Ross's body based in part on what Denis Greene said, Williams's response to Jackson was that this was just another example of the

slander and harassment Denis was putting her and Amber Press through and that it was part of the "conspiracy" against Amber Press. Detective Jackson testified that he could find no evidence of a "conspiracy" against Amber Press during his rather extensive investigation nor could he find any link between Amber Press and Denis Greene in any way.

## DISCUSSION

### Prosecutorial Misconduct

[¶ 35] Williams's principal contention in this regard is that the prosecution made improper use of Greene's so-called "confession" as the theory of its case. The prosecution argued its theory of the case to the jury in both its opening statement and its closing statement. However, it is also evident that the State's theory of the case was actually a variation on statements that Williams made to the Cheyenne police. As noted above, her statements evolved over time, but eventually she made an admission that she did help Denis Greene carry Ross's body to the basement of her Cheyenne home and bury it there. During additional questioning, it was suggested to Williams that she was really just substituting the name "Denis Greene" for "Linda Greene" in that statement. Williams denied that and upon further questioning, stated that her memory had been "compromised" and she could not go on with the questioning.

[¶ 36] Moreover, Williams contends that despite the district court's very clear pretrial ruling that Greene's statement that she shot Ross was not admissible, the prosecutor made several references to it. Williams further maintains that those references constitute misconduct that was prejudicial to her defense and denied her a fair trial. Williams contends that, in spirit, she objected to all such comments because the district court granted a pretrial motion prohibiting them. However, in a couple of instances she did not specifically object at the time the prosecutor made references to Greene's so-called "confession." Thus, to the extent she failed to object, the errors must be reviewed under the plain error doctrine.

934

[¶ 37] Before we will hold that an error in the nature of prosecutorial misconduct has affected an accused's substantial right, thus requiring reversal of a conviction, we must conclude that based on the entire record a reasonable possibility exists that in the absence of the error the verdict might have been more favorable to the accused. *Jensen v. State*, 2005 WY 85, ¶ 23, 116 P.3d 1088, 1098 (Wyo.2005) (and cases cited therein); also see *Butcher v. State*, 2005 WY 146, ¶ 38, 123 P.3d 543, 554 (Wyo.2005).

[¶ 38] In his opening statement, the prosecutor called Greene's "confession" to the attention of the jury ("... [Denis Greene] decides to report what he has been told. He tells detective Padilla that he's been told by a certain individual that Allen Ross has been murdered, that he's been shot in the head, that his body is buried in the basement...."). We are compelled to agree that under the circumstances of this case, that was clearly a reference to Greene's statement that she killed Ross. However, it was also obscure enough given the jury's limited access to all the facts that we cannot conclude that, absent this statement, the verdict might have been more favorable to the accused.

[¶ 39] Williams also contends that during his cross-examination of Denis Greene, the prosecutor violated the trial court's liminal order. The context of the exchange is important. Denis Greene is describing his contacts with Williams and Greene in early 1996. He related that they visited him and Daniel Greene often. Denis Greene noted that while Greene was in a mental hospital, to which she was committed by her family, she accused Denis by phone and FAX of killing Ross. Denis Greene stated that, "... at that point that's when I began to think perhaps [Ross] didn't run away, perhaps they killed him." Denis Greene further related that on February 20, 1996, Greene and Williams again visited him. On this occasion Williams was standing back with her hands in the pockets of a heavy coat (and it was a very warm day in Kansas City), and this scared Denis. His implication was that Williams might have had something in her coat pockets (e.g., a 9–millimeter pistol)

that could be used to harm Denis. Defense counsel objected on the basis of W.R.E. 404(b) but the district court overruled the objection. The exchange then continued:

Q. [By prosecutor] After that encounter what did you do?

A. That was a surprise visit on the 20th. On the 21st I called a detective Padilla with the Wyoming police to tell him of my suspicions.

Q. At that point in time had you ever been provided with any direct statement from anyone what had happened to Allen?

A. Yes.

Q. When were you given that statement?

A. On November 25th.

[¶ 40] Defense counsel objected and the objection was sustained. However, the prosecutor continued somewhat along the same line:

Q. What did you tell Detective Padilla?

A. I told the detective—I repeated to detective Padilla what [Greene] had told me—

[¶ 41] Again, defense counsel interposed an objection and asked that the district court grant her motion for a mistrial. The district court sustained the objection but denied the motion for mistrial.

[¶ 42] The trial court's response to the objection made it clear that the prosecutor was treading on questionable ground. However, this too was only an oblique reference to the prohibited statement made by Greene and, once again, given the jury's limited access to all the facts, we cannot conclude that absent this statement the verdict might have been more favorable to the accused. For the most part, the entire exchange amounted to legitimate evidence that suggested that Greene and Williams could be the persons who killed Ross, without there being any mention that she actually stated that she did do it.

[¶ 43] Williams also contends that the many allusions to Greene's "confession" were exacerbated by two seemingly deliberate comments that prejudiced her right to a fair trial. The first of these was a comment by

the prosecutor in the form of a joke that a defense attorney could tell that the client is not telling the truth if her lips are moving. Defense counsel promptly objected and the trial court just as promptly sustained the objection. The second was to compare this case to the Scott Peterson case, i.e., that it was a circumstantial evidence case. Again, defense counsel objected and the trial court sustained the objection and ordered the comment stricken.

[¶ 44] We conclude that here the prosecutor's misconduct, to the extent it was misconduct, was not prejudicial to Williams and there is not a reasonable possibility that the verdict might have been more favorable to her had the misconduct not occurred. The trial court was diligent in policing this prosecutor and the defense was alert to ensure that the jury was not lead astray by the prosecutor's attempts to inject prejudicial information into the trial process. Compare, *Wilde v. State,* 2003 WY 93, ¶¶ 26–31, 74 P.3d 699, 710–12 (Wyo.2003).

**Sufficiency of the Evidence**

[¶ 45] Our standard of review is well known. In addressing a claim of insufficiency of the evidence, we must determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. When considering a claim of the sufficiency of the evidence, we review that evidence with the assumption that the evidence of the prevailing party is true, disregard the evidence favoring the unsuccessful party, and give the prevailing party the benefit of every favorable inference that we may reasonably draw from the evidence. We will not reweigh the evidence nor will we re-examine the credibility of the witnesses. *Perritt v. State,* 2005 WY 121, ¶ 9, 120 P.3d 181, 186 (Wyo.2005) (and cases cited therein).

[¶ 46] Williams challenges only one of the elements of the crime at issue here. She asserts that there is insufficient evidence that Greene was the person who unlawfully killed Ross. Applying the standard of review set out above, we conclude the evidence is sufficient. Of course, it is difficult to know which details of the evidence the jury focused

on in reaching its ultimate decision. However, we will set out one line of reasoning that the jury might well have followed. The first prong in that line of reasoning is that Williams was not a credible witness. She told so many variations on her story, that the jury was unlikely to have accepted as truthful any of her statements that were self-serving or tended to exonerate her. Williams admitted that she was present when Denis Greene shot and killed Ross, and she admitted that she helped carry his body to the basement and bury it. Other evidence strongly suggested that Denis Greene was not there when the killing took place. Yet other evidence suggested strongly that the only other people present when Ross was shot were Greene and Williams. By the process of elimination, the jury could infer that it was Greene who shot Ross. The evidence demonstrated that Greene had a reason to do it, that she carried a gun similar to the one that was used to shoot Ross, and that her accusation that Denis Greene was the one who shot Ross was designed to divert attention from her as the one responsible for Ross's disappearance, to Denis Greene. Williams's apparent motive in diverting attention from Greene as the killer was to protect and preserve her memory/legacy. When pressed to respond to a question which directly proposed that the real scenario was not that she had assisted Denis Greene in burying Ross, but rather Greene, Williams appeared to hesitate and protested that her memory had been compromised and she could not remember any longer.

[¶ 47] We conclude that the evidence was sufficient to sustain the jury's verdict of guilt.

**CONCLUSION**

[¶ 48] Finding no error in the proceedings below, and that the evidence is sufficient to sustain the verdict, the judgment and sentence of the district court are affirmed in all respects.