2007 WY 111

**Marco Pedro LEMUS, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. 06–68.

Supreme Court of Wyoming.

July 17, 2007.

Representing Appellant: Daniel G. Blythe * and Karen Ashcraft Byrne, Cheyenne, Wyoming. Argument by Ms. Byrne.

Representing Appellee: Patrick J. Crank, Wyoming Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; and James Michael Causey, Assistant Attorney General. Argument by Mr. Causey.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

HILL, Justice.

█ Appellant, Marco Pedro Lemus (Lemus), challenges his convictions for first degree felony murder (murder committed during the course of a robbery [1]) and conspiracy to commit aggravated robbery. We will affirm.

## ISSUES

█ Lemus raises these issues:

1. Uncharged evidence was improperly presented to the jury when the State showed the jury a video without redacting evidence of other crimes.

2. The pathologist's testimony was improperly admitted without adequate foundation when he was not the pathologist who performed the autopsy.

3. The prosecutor's remarks in closing argument constituted impermissible prosecutorial misconduct when he professed a belief that he had put on enough evidence to indicate guilt.

4. It was improper not to allow and pay for [Lemus] to have his own expert witnesses.

5. If the prosecutor used fake pictures and allowed perjured testimony to be presented, then a new trial should be granted.

6. It was error for the trial court not to allow [Lemus] to talk with the alleged co-conspirators.

7. If the trial court were not allowing [Lemus] to issue his own trial subpoenas, error was created.

8. It was error for the trial court to deny [Lemus's] motion for a change of venue.

9. [Lemus] maintains that jury selection was improperly conducted.

10. [Lemus] maintains the prosecutor improperly threatened and intimidated witnesses.

11. The prosecutor's opening statement was improper when he announced he would call several witnesses and then did not call them.

12. Insufficient evidence was produced to sustain a conviction of conspiracy.

The State has reorganized the issues into five categories:

I. The prosecutor did not commit misconduct, sufficient to warrant reversal of [Lemus's] convictions, in his opening and closing arguments, in his alleged threatening and intimidation of witnesses, or in his alleged use of "fake pictures" and perjured testimony.

II. The district court did not hinder [Lemus's] right to present his defense when it allegedly did not offer him experts to assist with his defense, allegedly refused to

---

* Order allowing Daniel G. Blythe to withdraw entered on Nov. 15, 2006.

1. Lemus was also convicted of attempted aggravated robbery, but that merged into the felony murder conviction for purposes of sentencing. Lemus was sentenced to 8 to 10 years for the conspiracy and to a consecutive life sentence for the felony murder.

allow him to speak with his coconspirators, and allegedly refused to allow him to issue his own subpoenas.

III. The district court did not commit error in allowing [Lemus's] videotaped confession—which [Lemus] insists contained W.R.E. 404(b) evidence—to be played in its entirety, or in allowing the admission of testimony from Dr. Robert Deters concerning the nature of the victim's wounds.

IV. The district court did not interfere with [Lemus's] right to a trial by an impartial jury when it denied his motion for change of venue, or in its method of jury selection.

V. Sufficient evidence supported [Lemus's] conviction for conspiracy to commit aggravated robbery.

### FACTS AND PROCEEDINGS

#### General Matters

[¶ 3] When the proceedings in this case were initiated, Lemus was represented by a public defender. Later in the proceedings, he undertook to represent himself at the pretrial proceedings and during his jury trial.[2] He was assisted by standby counsel. As is so often the result in cases where a defendant chooses to represent himself, this case became somewhat muddled because of Lemus's performance as his own attorney, as well as because of other circumstances related to Lemus's family and codefendants. No claim is made in this appeal that the district court erred in its rather thorough effort to warn Lemus of the dangers and disadvantages of representing himself.

[¶ 4] This is the third in a series of cases that arose out of the robbery and murder of Manuel Leon–Leyva, in Lincoln County, in February of 2004. *See Rawle v. State,* 2007 WY 59, 155 P.3d 1024 (Wyo.2007); and *Talley v. State,* 2007 WY 37, 153 P.3d 256 (Wyo. 2007). Although we will, of course, rely only upon the evidence presented at Lemus's trial in resolving whether or not the evidence was sufficient in his case, we provide this sum-

mary of the evidence taken from the *Rawle* case for purposes of background, clarity, and structure in addressing the issues raised by Lemus.

In early February of 2004, Mr. Rawle departed from South Dakota with his girlfriend, Eyvette Talley, and her three children, along with Ms. Talley's brother, Marco Lemus, his wife, Tiffany Lemus, and their three children. The group traveled in a 1989 Cadillac and headed to Arizona. They passed through Wyoming and planned a stop in Kemmerer, Wyoming, where Mr. Rawle had a connection with a drug dealer that he had established when he was previously employed in the area. At some point during their trip, Mr. Lemus, Ms. Talley, and Mr. Rawle devised a plan to rob the drug dealer, Manuel Leon–Leyva.

When they arrived in Kemmerer, Mr. Rawle contacted Mr. Leon–Leyva and requested that they meet for a drug transaction at a local grocery store. Mr. Lemus, Ms. Talley, and Mr. Rawle armed themselves with steak knives. They left Mrs. Lemus and the children in the Cadillac to meet Mr. Leon–Leyva, who arrived at the meeting location driving his vehicle. Mr. Leon–Leyva was then robbed and stabbed to death in his vehicle.

Mr. Rawle drove Mr. Leon–Leyva's vehicle, followed by the Cadillac driven by Ms. Talley, to a remote location. The three perpetrators burned the victim's vehicle and body in an attempt to destroy the evidence of their crimes. The charred vehicle and remains were later discovered and an investigation ensued.

*Rawle,* ¶¶ 3–6, 155 P.3d at 1026.

On June 14, 2004, a felony information was filed against Lemus, charging him with second-degree homicide. The State amended the information to include the charges for which he was convicted, as set out above. Lemus was living in Florida at the time of his arrest, and he waived extradition back to Wyoming on June 22, 2004. The

---

**2.** Under the Sixth Amendment of the United States Constitution and art. 1, § 10 of the Wyoming Constitution, a defendant has a right to

represent himself. *See Hauck v. State,* 2001 WY 119, ¶ 16, 36 P.3d 597, 601–2 (Wyo.2001) (and cases cited therein).

Wyoming Public Defender was appointed to represent Lemus on August 20, 2004.

■ Lemus appeared before the district court for arraignment on September 30, 2004, at which time his appointed public defender requested a mental health examination for his client (over Lemus's objections). On September 30, 2004, the district court suspended the proceedings and sent Lemus to the Wyoming State Hospital for an evaluation for the following purposes:

(ii) An opinion as to whether the accused has a mental illness or deficiency, and its probable duration;

(iii) An opinion as to whether the accused, as a result of mental illness or deficiency, lacks capacity to comprehend his position, to understand the nature and object of the proceedings against him, to conduct his defense in a rational manner and to cooperate with his counsel to the end that any available defense may be interposed;

(iv) An opinion as to whether at the time of the alleged criminal conduct the accused, as a result of mental illness or deficiency, lacked substantial capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law;

(v) A recommendation as to whether the accused should be held in a designated facility for treatment pending determination by the court of the issue of mental fitness to proceed; and

(vi) A recommendation as to whether the accused, if found by the court to be mentally fit to proceed, should be detained in a designated facility pending further proceedings.

The evaluation was received by the district court on November 24, 2004, and all questions were essentially answered in the negative.

■ It is apparent from the record that there was conflict between Lemus and the attorney who was initially appointed to represent him. In part, this conflict arose because Lemus did not want a mental health evaluation. That attorney was permitted to withdraw, and a new public defender entered an appearance on Lemus's behalf on January 5, 2005. At first, Lemus very reluctantly agreed to allow that attorney to represent him.

[¶ 8] On January 19, 2005, the State filed its notice of intent to use W.R.E. 404(b) evidence. The State was thorough in its advocacy for use of this sort of evidence:

1. Evidence that [Lemus] and the other co-defendants and alleged co-conspirators used controlled substances on their trip from Sioux Falls, South Dakota, to Kemmerer, Wyoming. This evidence will not be introduced to prove the character of a person in order to show that he acted in conformity therewith, but to prove motive, intent, preparation, and a common plan. Further, the State plans to use said evidence because it is part of a continuing course of conduct that includes the crimes charged in the information. Events do not occur in a vacuum and jurors need to know about this uncharged conduct to realistically evaluate the evidence in this case. The jury has a right to hear what occurred immediately before and after the crime.

2. Evidence of various shopliftings that [Lemus] and co-defendants are alleged to have participated in between the time they left Sioux Falls, South Dakota, and arrived in Kemmerer, Wyoming, on the 6th day of February, 2004. Specifically the State intends to show that [Lemus] and co-defendants participated in shoplifting whereby the knives that were allegedly used to kill the victim were obtained. This evidence will not be introduced to prove the character of a person in order to show that he acted in conformity therewith, but to prove motive, intent, preparation, and a common plan. Further, the State plans to use said evidence because it is part of a continuing course of conduct that includes the crimes charged in the information. Events do not occur in a vacuum and jurors need to know about this uncharged conduct to realistically evaluate the evidence in this case. The jury has a right to hear what occurred immediately before and after the charged crime.

3. The burning of the vehicle belonging to Manuel Leon–Leyva and also the burned body contained in that vehicle.

This evidence will not be introduced to prove the character of a person in order to show that he acted in conformity therewith, but to prove motive, intent, preparation, and a common plan. Further, the State plans to use said evidence because it is part of a continuing course of conduct that includes the crimes charged in the information. Events do not occur in a vacuum and jurors need to know about this uncharged conduct to realistically evaluate the evidence in this case. The jury has a right to hear what occurred immediately before and after the crime.

The State knew about this evidence from Lemus's confession. The State also gave notice of its intent to use hearsay evidence as provided for in W.R.E. 804(b)(6), specifically testimony from the victim's widow that her deceased husband told her that a person who turned out to be Rawle was in town the day the victim was murdered.

[¶ 9] Lemus filed a motion for change of venue and the State responded to it, contending that it should not be considered unless it was not possible to seat an impartial jury. Eventually, the district court denied that motion and proceeded to jury selection. A jury was selected with dispatch and that process gave no sign that a change of venue was necessary. Thereafter, Lemus did not further pursue his request for a change of venue.

[¶ 10] On January 24, 2005, Lemus's appointed public defender filed a notice that Lemus intended to represent himself in all additional proceedings and made a request to act as standby counsel only. On January 28, 2005, the presiding judge recused himself from Lemus's case because the judge's son was an assistant county attorney in Lincoln County. The case was then assigned to the Honorable Wade E. Waldrip, from the Second Judicial District (Carbon County). On February 22, 2005, Lemus waived his right to a speedy trial. An initial pretrial order setting a trial date in Carbon County was inadvertently sent out. At the first hearing on motions in the case, Judge Waldrip made clear that there had been no change of venue, that the indication that the trial was to be in Carbon County was an inadvertent error, and that the trial would be in Lincoln County, where the crime occurred.

[¶ 11] On May 3, 2005, Lemus filed approximately 62 motions asking that subpoenas be issued for witnesses for the defense. On that same date, he also filed approximately 20 substantive motions, including motions to suppress various statements he made to authorities, to suppress the mental evaluation from the State Hospital, to suppress the statements of other witnesses, for a Spanish interpreter because he intended to have many Spanish speaking witnesses, a motion for a gag order on himself and his co-defendants, and a motion to preclude his wife from testifying against him. The State provided individualized responses to all of these motions, as required by the district court. With respect to the motions for subpoenas, the State made clear that it understood that Lemus could request such subpoenas; however, the State reserved the right to object to them on the grounds of relevancy, competency, cumulativeness, or other applicable reasons. The district court also forewarned Lemus that subpoenas would issue only if he demonstrated the relevancy of the proposed witnesses' testimony.

[¶ 12] On June 3, 2005, the district court issued a scheduling order setting the trial in Lincoln County and acknowledging that Lemus would be permitted to represent himself, with the public defender acting as standby counsel.

[¶ 13] On June 22, 2005, Lemus filed 27 substantive motions which were, for the most part, duplicative of those filed in May. However, this set of motions included one for a team of expert witnesses. On that same date, he filed approximately 56 motions to subpoena witnesses for his defense, and most of those were also duplicative of the subpoenas requested in May. An additional 20 motions and petitions were filed in the district court by Lemus on August 1, 2005, and August 8, 2005. The State submitted its request for jury instructions and its lists of witnesses and exhibits on August 12, 2005. On August 12, 2005, Lemus filed two motions and a list of witnesses. On August 16 and 17, 2005, Lemus filed several hundred pages of documents that appeared to be his way of

complying with the district court's pretrial order. At a hearing on motions held on August 23, 2005, the district court went through all of Lemus's motions and requests for subpoenas and heard argument on them and ruled on them, one by one.

[¶ 14] As the time of trial approached, Lemus shortened his witness list considerably. However, as was the circumstance throughout this case, Lemus did not have a physical address for many of his selected trial witnesses. Instead, he provided a sort of metes and bounds description of a location, or a name of an employer, or just a city. In some instances, he provided no address whatsoever. The record reflects that extraordinary efforts were made to locate witnesses and serve subpoenas, but not all such efforts were successful.

[¶ 15] On October 3, 2005, the day before Lemus's trial began, the district court held a final motions hearing to take care of last minute details. However, much of that hearing was devoted to a sort of dress rehearsal of the trial procedures for the benefit of Mr. Lemus.

**The Evidence Presented at Lemus's Trial**

[¶ 16] On February 7, 2004, a pumper for EOG Resources was checking on wells near Exxon's Shute Creek facility in Lincoln County when he found a burnt vehicle with a dead human body in it. The vehicle had not been there when he was at that same site the day before. He also found a road map atlas near the burnt vehicle. That atlas was eventually tied to Lemus and his coconspirators. Cross-examination by Lemus revealed that the passenger door of the vehicle was open. This took on some significance as the trial progressed because, in his confession, Lemus related how his group had to return to the vehicle because they could see from their vantage point that the first fire they started in the vehicle had gone out. They figured out that the fire went out because it had no oxygen source. Thus, they returned to the vehicle and lit the fire again leaving two windows and the passenger door open. An investigating officer found a gas cap near the crime scene. That was significant because Lemus related that it was removed from Leon–Leyva's car so that they could try to get gas to use as an accelerant to hasten the ignition of the fire.

[¶ 17] The body found in the vehicle was first identified by associating it with the owner of the burned vehicle, Manuel Leon–Leyva. From Leon–Leyva's wife, it was ascertained that he had left home the night before to meet a friend he knew as "Cowboy." The nickname "Cowboy" was later tracked to Brian Rawle. DNA tests established that the body in the burnt vehicle was that of Leon–Leyva.

[¶ 18] It was not until the police received a phone call from Tiffany Lemus on June 11, 2004, that they identified Lemus as a suspect. Lemus was arrested in Orlando, Florida on June 16, 2004, on unrelated charges (apparently instigated by his wife). While he was in custody on that matter, he was questioned by Deputy Sheriff John Stetzenbach from Lincoln County and Agent James T. Whinnery of the Wyoming Division of Criminal Investigation. The interview with Lemus was preserved on video tape and was played for the jury in its entirety. Lemus made no objection to the tape being shown in an unedited format to the jury.

[¶ 19] There was no audio at the beginning of the tape, just Lemus pacing around in an interview room. Lemus insisted that he was praying at that time and that there should have been audio. The trial court, with the jury present, accepted Lemus's contention that he was praying and the viewing of the tape continued. In the video taped interview, Lemus admits many times that he was an active participant in the plan to rob Leon–Leyva and the actual murder of him, as well as the burning of his body.

[¶ 20] Although there are a few points in the tape where the transcription is noted to be inaudible, our review of it established that nothing of apparent substance was inaudible. In addition, we note that Lemus talked at length about many things, some pertinent to the questions asked of him and some just volunteered information. Although what he had to say did not always make "sense," we are satisfied that the vast majority of the tape was audible, and that the transcript in

the record is an accurate repetition of the taped interviews.

[¶ 21] We also note that Lemus believed, or feigned a belief, that the police officers were there to talk to him about his wife's claim that he was stalking her. After several minutes of bantering back and forth, the police officers redirected Lemus's attention to why they were there. Lemus seemed to know why they were there and initially he wanted to know where his wife was and indicated that he would talk with them, but first he wanted to know where his wife was, and later wanted to know exactly who told them about what had happened in Wyoming. Eventually, Lemus agreed that he would "give it to you guys on a silver platter as long as we are all charged the same." Once the police officers told Lemus that it was his wife Tiffany that they had talked to, Lemus related that there were four of them involved: He was involved, his wife Tiffany was involved, his sister Eyvette Talley was involved, and Eyvette's boyfriend Brian Rawle was involved. They made a plan to contact Leon–Leyva and to rob him for the drugs and money he might have. That plan included that if anything "goes bad," they were all going to cover it up together. They were all armed with steak knives, and it was also understood that if things "went bad," they would kill Leon–Leyva. After stabbing him to death, they then drove Leon–Leyva's car into the countryside near Kemmerer and lit it afire.

## DISCUSSION

### Change of Venue

■ [¶ 22] Lemus filed a motion for change of venue. That motion was never supported by either cogent argument or pertinent authority. As noted above in the facts section, Lemus thought he had been granted a change of venue because of an error in the district court's trial setting order. The record makes clear that it was an error, and that the district court did not intend to consider the motion for change of venue until after jury selection was completed.

■ [¶ 23] We review the denial of a motion to change venue under the abuse of

discretion standard. *Urbigkit v. State*, 2003 WY 57, ¶ 26, 67 P.3d 1207, 1220 (Wyo.2003). We employ this analytical process to that review:

> Criminal defendants in Wyoming have a constitutional right to a trial by an impartial jury. Wyoming's constitutional provision grants the right to trial "by an impartial jury of the county or district in which the offense is alleged to have been committed." Wyo. Const. art. 1, § 10. The legislative provision mirroring the constitution requires "[e]very criminal case shall be tried in the county in which the indictment or offense charged is found, except as otherwise provided by law." Wyo. Stat. Ann. § 1–7–102(a) (LEXIS 1999). Trial proceedings are transferred to another county "only if the court is satisfied that there exists within the county where the prosecution is pending so great a prejudice against the defendant that the defendant cannot obtain a fair and impartial trial in that county." W.R.Cr.P. 21(a).
>
> This Court has adopted a two-part test for determining whether a change of venue should be granted after *voir dire* because of pre-trial publicity: " 'First, the nature and extent of the publicity must be considered; second, the difficulty or ease in selecting a jury must be considered along with the amount of prejudice which actually appears during *voir dire* examination.' " *Sides [v. State]*, 963 P.2d [227,] 231 [ (Wyo. 1998) ] (quoting *Murry [v. State ]*, 713 P.2d [202,] 208 [ (Wyo.1986) ] ).

*Id.*, ¶ 27 (quoting *Nixon v. State*, 994 P.2d 324, 326–27 (Wyo.1999)); *and see Schwenke v. State*, 768 P.2d 1031, 1033 (Wyo.1989).

[¶ 24] Lemus made no attempt to demonstrate the level of pretrial publicity, although we will take note that this was a high profile crime in Lincoln County and that his codefendants were also tried there before Lemus was. In neither of those cases was venue an issue on appeal. *Rawle*, 155 P.3d 1024; *Talley*, 153 P.3d 256. Sixty-five jurors were summoned for Lemus's trial. Of those, 12 had heard about the case in the media or from other sources, such as friends, co-workers, etc. Each of those jurors was closely examined. One juror expressed a view that

he could not put aside the opinion that he had adopted (he was not asked what that opinion was). He was excused for cause. At the close of voir dire, Lemus passed the jury for cause and had no objections to the jury selection process.

[¶ 25] We have applied the standard of review outlined above, and we conclude that the district court did not abuse its discretion in denying the motion for a change of venue.

**Challenge to Jury Selection Process**

[¶ 26] We need not spend much additional time on this issue. At trial, Lemus had no objections to the jury selection process, and he passed the jury that was selected for cause. He exercised all of his peremptory challenges. We have carefully examined the voir dire and we find no irregularities of any sort. Lemus's brief fails to present cogent argument or pertinent authority that persuades us to examine this issue further. *See, e.g., Statezny v. State,* 2001 WY 22, ¶ 11, 18 P.3d 641, 644–45 (Wyo.2001). For these reasons, we conclude that the jury selection process was not erroneous in any way.

**Defendant's Subpoenas**

[¶ 27] As a part of the lengthy and very complete warnings the district court gave Lemus with respect to disadvantages of representing himself at trial (with standby counsel), the district court specifically called Lemus's attention to the circumstance that the district court could not aid Lemus in subpoenaing witnesses, and that he would be required to demonstrate the relevance of the testimony of all proposed witnesses. Moreover, the trial court emphasized that it could not aid Lemus in arranging interviews with witnesses from his jail cell, or with witnesses who were incarcerated elsewhere.

[¶ 28] We need not get too far beyond generalities in this regard, because the record supports only a conclusion that all the witnesses Lemus wanted to call either appeared voluntarily (with or without subpoena) or were summoned by means of subpoena. It is unquestioned that a defendant in a criminal case has a constitutional right to a fair trial, and that includes the right to summon witnesses in his defense. U.S. Const Amend. VI (". . . to have compulsory process for obtaining witnesses in his favor. . . ."); Wyo. Const. art. 1, § 10 ("In all criminal prosecutions the accused shall have the right . . . to be confronted with the witnesses against him, to have compulsory process served for obtaining witnesses. . . ."). Wyo. Stat. Ann. §§ 7–11–402 and 7–11–405 (LexisNexis 2007). It is, however, the defendant's burden to ensure that the witnesses he wants are summoned. 81 Am.Jur.2d *Witnesses* § 4 (2004 and Supp.2006).

[¶ 29] It is transparent in the record that Lemus's concept of a "material witness" was very broad. For instance, for reasons that Lemus did not articulate, he wanted to subpoena all the members of the Commission on Judicial Conduct and Ethics. The district court would not approve that. However, the district court did allow Lemus to subpoena an employee of the State Crime Lab whose testimony appeared to be relevant. In addition, the clerk of the district court in Lincoln County met with Lemus in his cell in an effort to further identify, locate, and serve Lemus's witnesses. *See* Jay M. Zitter, Annotation, *Sufficiency of Evidence to Support or Require Finding that Out–of–State Witness in Criminal Case is "Material Witness" Justifying Certificate to Secure Attendance Under Uniform Act to Secure the Attendance of Witnesses from Without a State in Criminal Proceedings,* 12 A.L.R.4th 742 (1982 and Supp.2006); Jay M. Zitter, Annotation, *Sufficiency of Evidence to Support or Require Finding that In–State Witness in Criminal Case is "Material and Necessary" Justifying Issuance of Summons Directing Attendance of Witness Under Uniform Act to Secure the Attendance of Witnesses from Without a State in Criminal Proceedings,* 12 A.L.R.4th 771 (1982 and Supp.2006); Romualdo P. Eclavea, Annotation, *Right of Indigent Defendant Under Rule 17(b) of the Federal Rules of Criminal Procedure to Appearance of Witnesses Necessary to Adequate Defense,* 42 A.L.R.Fed 233 (1979 and Supp.2006).

[¶ 30] So far as the record shows, all witnesses who Lemus wanted to call were summoned. Even the many witnesses for

whom Lemus could not provide a street/delivery address were sought and served, if possible. However, at no point in the record does Lemus complain that there was a witness, whose testimony was material to his trial, who he was unable to call to the witness stand. We have examined the record with care and find that the district court did not abuse its discretion in any way with respect to requiring the issuance of subpoenas on Lemus's behalf.

### Lemus's Contact with Coconspirators/Codefendants

[¶ 31] It is evident from Lemus's brief that this particular issue, as well as many other issues, were raised in this appeal because he wanted them to be raised and not necessarily because they had any merit. In addition, contrary to an allegation stated in his brief, Lemus received copies of the transcripts of his codefendants' trials.

[¶ 32] We conclude that, with respect to this issue, it suffices to note that neither in the trial court below, nor in this appeal, has Lemus articulated a desire to have his codefendants called as witnesses, nor has he provided any cogent argument to suggest that the district court abused its discretion with respect to a request made by Lemus to communicate with his codefendants or to call them as witnesses on his behalf. *See, e.g., Doles v. State,* 2002 WY 146, ¶ 5, 55 P.3d 29, 31 (Wyo.2002).

### Lack of Expert Witnesses for Defense

▮ [¶ 33] As a general statement of the applicable rule, a defendant in a criminal case may be entitled to access to expert witnesses if there is a reasonable probability that an expert would aid in his defense and that the denial of an expert would result in an unfair trial. Such decisions rest in the sound discretion of the trial court. *Williams v. Martin,* 618 F.2d 1021 (4th Cir.1980); and *see generally* Ruby B. Weeks, Annotation, *Right of Indigent Defendant in Criminal Case to Aid of State by Appointment of Investigator or Expert,* 34 A.L.R.3d 1256, §§ 2–4 (1970 and Supp 2007).

[¶ 34] At trial, Lemus asked for expert witnesses. He had a theory of the case that he attempted to present to the jury, even though it was not supported by any testimony or other evidence. That theory was that he acted in self-defense when he killed Leon–Leyva. To a large extent, this theory was supported only by his "assertion" that Leon–Leyva attacked first, and not by testimony or other evidence to that effect. Lemus did not testify on his own behalf. However, in many of his cross-examinations, Lemus suggested that what the witness had to say was not quite the truth, or at least not the whole truth, and Lemus knew that because he was there. As we will discuss in more detail in the final issue (sufficiency of the evidence), Lemus's confession, conjoined with other circumstantial evidence, sufficed to provide evidence of all the elements of the crimes for which he was convicted. The confession did not intimate in any way that he acted in self-defense, but only that when the Lemus/Rawle/Talley threesome tried to effectuate the robbery plan, Leon–Leyva ferociously fought back. Another prong of Lemus's defense was that he lied in his confession about many things. His ostensible motive for lying was to implicate his wife as a principal in the commission of the crimes, and he agreed to confess only if the State would promise that his wife would face the same charges as the other three. Indeed, Lemus suggested that he, Rawle, and Talley agreed to adjust their "stories" to achieve that result, *i.e.,* to get his wife (or ex-wife) convicted of murder.

[¶ 35] Lemus wanted experts to testify on his behalf in order to bolster his contentions that he lied in making his confession and to bolster his self-defense claims. In his confession, Lemus said that although he had drawn the first blood, Leon–Leyva overpowered him and managed to cut him on the face quite severely. A codefendant then proceeded to stab Leon–Leyva in the throat and did so with such violence that Leon–Leyva's head was nearly severed. Lemus attempted to show this was a lie on his part during his cross-examination of Robert Deters, M.D., a pathologist with a specialty in forensic pathology. However, Dr. Deters did not share Lemus's view of the evidence largely because Leon–Leyva's body was so consumed by fire that no such evidence existed.

[¶ 36] Another of Lemus's theories was that he was lying because Leon–Leyva's body could not have been found in the position in which it was found, based upon his confession. Lemus believed that an expert could help him establish that theory, and that establishing his theory would support his self-defense theory, thus mandating reversal of his conviction.

[¶ 37] We conclude that the district court did not err in not ordering Lemus to have access to expert witnesses because of Lemus's failure to establish *any* foundational facts that would have justified expert testimony.

**Errors in State's Opening and Closing**

■ [¶ 38] Lemus contends that a combination of errors/misconduct by the prosecutor in opening argument and closing argument combined to deprive him of a fair trial and necessitates the reversal of his convictions. We note here that Lemus did not object to the arguments in either opening or closing. However, Lemus would have had no cause to object to the opening statement because it was merely the prosecutor summarizing the evidence that he intended to present. The "error" asserted here did not take on substance until the prosecutor then "explained" in closing argument his reasons for not calling certain witnesses. The jury was instructed that the arguments of counsel were not evidence (this included Lemus's argument, as well as that of the prosecutor).

■ [¶ 39] Our standard of review is well known. Before we will hold that an error in the nature of prosecutorial misconduct has affected an accused's substantial right, thus requiring reversal of a conviction, we must conclude that based upon the entire record, a reasonable possibility exists that in the absence of the error, the verdict might have been more favorable to the accused. *E.g., Williams v. State,* 2006 WY 131, ¶ 37, 143 P.3d 924, 934 (Wyo.2006); *Jensen v. State,* 2005 WY 85, ¶ 23, 116 P.3d 1088, 1098 (Wyo.2005) (and cases cited therein); *Butcher v. State,* 2005 WY 146, ¶ 38, 123 P.3d 543, 554 (Wyo.2005). In reviewing a claim of prosecutorial misconduct in closing argument, the court looks at the entire record to

determine whether or not the defendant's case was so prejudiced by the improper comments as to result in the denial of a fair trial. We judge the challenged comments in the context of the prosecutor's entire argument, considering the context of the statements and comparing them with the evidence produced at the trial. The burden of establishing prosecutorial misconduct rests upon the appellant who raises the issue.

[¶ 40] The prosecutor told the jury that he intended to call Tiffany Lemus, wife of the defendant, as a witness in his case. He also said that he would call FT (a juvenile), niece to Lemus, as a witness. Both had testified in the trials of coconspirators Talley and Rawle. The prosecutor suggested that their testimony would corroborate much of Lemus's confession. The record reflects that these witnesses created a dilemma for the prosecutor. Of course, Lemus had objected to the testimony of his wife. Lemus proposed to have them testify that the prosecutor threatened and intimidated them in order to get them to testify, and it appeared that they could well have been "hostile" to the prosecution's case. The record reflects that both witnesses were present at the trial and Lemus could have called them to the stand if he wanted to do so. He opted not to call them himself. In his closing argument, the prosecutor chose to make a pre-emptive strike on this point, before Lemus could broach the subject, telling the jury:

Now, if you remember back last Tuesday in my opening statement, I told [you] what I thought the evidence would show and the evidence that would come on. I told you you'd hear from some witnesses that you didn't hear from. Any of you familiar with sports, baseball? It's October [the trial is underway in October of 2005]. A lot of people who don't watch baseball throughout the rest of the year start watching baseball in October. There are strategies involved in a game of baseball and there are strategies involved when a lawyer presents his case. And sometimes the lawyer's strategy changes midway between the case, just like a ball game will change within even an inning of baseball. The State did not put on [FT] like I

told you I would. We did not put on Tiffany Lemus like I told you I would. I changed my strategy. The reason I did that is because I believed that I had sufficient evidence to show to you at that point to convict the Defendant with proof beyond a reasonable doubt without their testimony. So I made that decision.

The prosecutor then went on to catalogue the evidence that he did present which proved Lemus's guilt. Lemus did not object to these comments, and so we review this assertion of error under the plain error standard. First, the record must clearly present the incident alleged to be error. Second, Lemus must demonstrate that a clear and unequivocal rule of law was violated in a clear and obvious, not merely arguable, way. Last, Lemus must prove that he was denied a substantial right resulting in material prejudice to him. *Lopez v. State*, 2006 WY 97, ¶ 18, 139 P.3d 445, 453 (Wyo.2006)

 [¶ 41] The record clearly reflects the argument made by the prosecutor, but the error of it, if any, is not so patent. We have repeatedly held that a prosecutor may not vouch for the credibility of the State's witnesses, even in responding to defense arguments. *Dysthe v. State*, 2003 WY 20, ¶ 29, 63 P.3d 875, 886 (Wyo.2003). That is a clear and unequivocal rule. However, that the rule was violated in a clear and obvious, not merely arguable, way is not so clear. The prosecutor did not directly vouch for the credibility of his witnesses, only that the evidence he did present sufficed to meet the burden that the State carries to prove its case beyond a reasonable doubt. Of course, the State's principal witness was Lemus himself. All the other witnesses merely tied up loose ends. Misconduct by a prosecutor invokes a criminal defendant's right to a fair trial and can be an error of constitutional magnitude. However, under the somewhat unique circumstances of this case we conclude that the argument challenged did not violate the relevant rule in a clear and obvious way. Moreover, to the extent the argument could be said to have been ill advised, it did not serve to prejudice Lemus.

## Prosecutor's Threatening/Intimidating Witnesses

[¶ 42] Lemus contends that the prosecutor threatened/intimidated witnesses. This is an issue that appears in the record only as a contention made by Lemus, but was never supported by any evidence admitted during the trial or in any pretrial proceeding. Because there is no material in the record to support it, we will not consider it.

## State's Use of Fake Pictures and Perjured Testimony

[¶ 43] Much like the contention discussed immediately above, this one also has no support in the record. Lemus looked at the pictures offered by the State and contended that they had to be fakes because he was there and they did not correspond with his memory of the events he related in his confession. Because there is nothing in the record to support his contention that the pictures were "fakes," we will not consider it further. Likewise, Lemus says that witnesses perjured themselves because they said things that he did not agree with. This contention is unsupported by anything in the record, and we will not consider it further. In fairness, we take note that Lemus's brief suggests that some matters raised in the brief (perhaps many of them) are broached so as not to waive them in future post-conviction proceedings, should there be any.

## State's Use of Substitute Pathologist

[¶ 44] J. Wallace Graham, M.D., performed the autopsy on Leon–Leyva's body. Dr. Graham was not available at the time of Lemus's trial because he was out of the country. In his place, Robert Deters, M.D., testified concerning the autopsy and the cause of the victim's death, using the materials developed by Dr. Graham during the autopsy. It is unclear exactly what Lemus's objections are in this appeal, but he voiced no objections below. Indeed, Lemus sought to use Dr. Deter's testimony to his advantage. Lemus's contentions with respect to Dr. Deter's testimony are not supported by cogent argument or pertinent authority, and we will not consider them further.

## Introduction of W.R.E. 404(b) Evidence in Video Taped Confession

[¶ 45] Lemus contends that the video tape of his confession should have been edited because it contained so much W.R.E. 404(b) evidence. The State contends that it is relevant because it tells the whole story that unfolded over the few days which bracket the crime. In his confession, Lemus talks quite a bit about his drug use. It appears he wanted much of that to be included because he intimated that it mitigated his conduct (he had been up for days on methamphetamines). Lemus also related that his group shoplifted in order to live as they traveled nomadically through Nebraska, South Dakota, Wyoming, Utah, and Arizona. Although Lemus attempted to suppress his confession, once the district court determined it was admissible, he wanted the entirety of it to be presented to the jury. The district court allowed the entire tape to be played for the jury (and a transcript of the tape appears in the record).

[¶ 46] The district court fully considered all of Lemus's objections to the confession and its content and determined that it was admissible even in light of Rule 404(b). There was no error in that ruling. However, we also agree with the State that, under the circumstances presented here, the disputed evidence was not Rule 404(b) evidence.

## Sufficiency of the Evidence

[¶ 47] Lemus contends that the evidence was not sufficient to sustain the jury's verdict finding him guilty of conspiracy. It is his assertion that the only evidence of the conspiracy came through his video taped confession, and that evidence does not suffice to sustain the conspiracy verdict. In addressing a claim of insufficiency of the evidence, we must determine whether or not any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. When considering a claim of the sufficiency of the evidence, we review that evidence with the assumption that the evidence of the prevailing party is true, disregard the evidence favoring the unsuccessful party, and give the prevailing party the benefit of every favorable inference that we may reasonably draw from the evidence. We will not reweigh the evidence nor will we re-examine the credibility of the witnesses. *Williams v. State*, 2006 WY 131, ¶ 45, 143 P.3d 924, 935 (Wyo.2006).

[¶ 48] In making this argument, Lemus relies solely upon our decision in *Wehr v. State*, 841 P.2d 104, 110–111 (Wyo.1992):

An analysis of the evidence of the conspiracy in this case persuades us the State produced ample evidence at trial from which a jury rationally might conclude Wehr and Thompson were co-conspirators in a drug distribution chain. First, the State introduced evidence Thompson and Wehr were engaged in an ongoing source-to-middleman for resale relationship that was mutually beneficial. Thompson testified she was a drug addict and she supported her habit by selling drugs to others. She said she had known Wehr for a number of years and she had sold drugs to him repeatedly for his personal use and for resale. Her testimony was that Wehr would buy only a quarter gram or half gram for his personal use but, when reselling drugs to others, he would buy substantially larger quantities. Thompson told the jury Wehr had admitted to her in the past that he resold drugs obtained from her to support his own habit.

The State also established by Thompson's testimony that Wehr and Thompson knowingly engaged in the source-to-middleman resale transaction on the date at issue. Thompson testified she sold three grams of methamphetamine to Wehr on December 23, 1988 and she had "no doubt" Wehr then would deliver the drugs to someone else. Furthermore, one of the DCI agents testified Wehr admitted, in the course of the March 2, 1989 interview, he had purchased methamphetamine from Thompson on December 23, 1988 which he later sold to Greenhalgh.

Finally, the State presented evidence that Thompson's interest in drug transactions extended well beyond simply satisfying the immediate customer. Thompson testified at trial that, after she had made the sale to Wehr, she was advised her name and that of Greenhalgh were being discussed over the police radio. Thompson

immediately telephoned Wehr and told him someone was "wired" and he should not sell the methamphetamine to Greenhalgh. Thompson earlier had testified she would not sell controlled substances to Greenhalgh because he resold the drugs to "youngsters." When she was asked at trial why she phoned Wehr, Thompson responded, "[s]o he would not sell to Perry [Greenhalgh] because Perry's name had come over the scanner too, and Paul knows if he was going to sell to Perry I would never sell to him again."

We hold, given the admissibility of Thompson's testimony relative to the prior transactions with Wehr, the jury rationally could infer from all of this evidence, along with all of the other evidence introduced at the trial, that Wehr and Thompson had an ongoing conspiratorial relationship to distribute drugs in violation of Wyoming's Controlled Substances Act. The jury further could infer the transaction on December 23, 1988 was a product of the ongoing conspiracy and simply an example of the method Wehr and Thompson used to distribute controlled substances in violation of the Wyoming Controlled Substances Act.

[¶ 49] From the above-cited discussion, Lemus concludes that he could not be convicted of conspiracy without one of his coconspirators testifying against him, which neither did. This question is answered by our discussion of the evidence needed to sustain a conspiracy conviction found in *Miller v. State,* 955 P.2d 892, 896–98 (Wyo.1998):

> While Miller primary relies upon his claim of entitlement to relief under the law of the case doctrine, the instruction on the unilateral theory of conspiracy poses a novel question for Wyoming. For that reason we consider whether that instruction was a correct instruction on the law. The Supreme Court of North Dakota has distinguished the bilateral theory of conspiracy from the unilateral theory in this way:
>
> "Under a unilateral formulation, the crime is committed *when a person agrees* to proceed in a prohibited manner; under a bilateral formulation, the crime of conspiracy is committed *when*

two or more persons agree to proceed in such manner. *See Note* [Conspiracy; Statutory Reform Since the Model Penal Code, 75 Colum.L.Rev. 1122, 1136 (1975)]. Under either approach, the agreement is all-important to conspiracy. Under the unilateral approach, as distinguished from the bilateral approach, the trier-of-fact assesses the subjective individual behavior of a defendant * * *. Under the traditional bilateral approach, there must be at least two 'guilty' persons, two persons who have agreed"

*State v. Rambousek,* 479 N.W.2d 832, 833–34 (N.D.1992), *citing State v. Kihnel,* 488 So.2d 1238, 1240 (La.App.1986).

> Prior to its revision in 1982, as amended in 1983, the statute making conspiracy a crime in Wyoming read:
>
> > If two (2) or more persons conspire to (a) commit a felony in the state of Wyoming or to commit an act beyond the state of Wyoming which if done in this state would be a felony, and (b) one (1) or more of such persons do any act, within or without the state of Wyoming, to effect the object of the conspiracy, each, upon conviction, shall be fined not more than one thousand dollars ($1,000.00) or imprisoned in the penitentiary not more than ten (10) years or both. A conspiracy may be prosecuted in the county where the conspiratorial agreement or combination was entered into, or in any county where any act or acts evidencing the conspiracy or in any county wherein the furtherance of its purpose took place.
>
> Wyo. Stat. § 6–1–117 (1977). As revised in 1982, and then amended in 1983, this statute now reads:
>
> > (a) A person is guilty of conspiracy to commit a crime if he agrees with one (1) or more persons that they or one (1) or more of them will commit a crime and one (1) or more of them does an overt act to effect the objective of the agreement.
>
> > (b) A person is not liable under this section if after conspiring he withdraws from the conspiracy and thwarts its success under circumstances manifesting

voluntary and complete renunciation of his criminal intention.

(c) A conspiracy may be prosecuted in the county where the agreement was entered into, or in any county where any act evidencing the conspiracy or furthering the purpose took place.

Wyo. Stat. § 6–1–303 (1988).

The new version was adopted from both the Model Penal Code and the laws of neighboring states. *See* THEODORE E. LAUER, *Goodbye 3–Card Monte: The* Wyoming Criminal Act of 1982, 19 Land & Water L.Rev. 107, 119 (1984). The Model Penal Code, like the new version of the Wyoming statute, defines conspiracy in the context of a single actor agreeing with another, and this language is said to adopt the unilateral approach. MODEL PENAL CODE & COMMENTARIES § 5.03(b) at 382–398 (Official Draft & Revised Comments 1985). While federal courts have continued to follow the bilateral theory of conspiracy, the modern trend in state courts is to rule that a conspiracy count is viable even when one of the participants is a government agent or is feigning agreement. *See generally,* MODEL PENAL CODE & COMMENTARIES § 5.03(b) at 382–398 (Official Draft & Revised Comments 1985); 2 Wayne R. La-Fave & Austin W. Scott, Jr., *Substantive Criminal Law* § 6.4(d). *Compare U.S. v. Barboa,* 777 F.2d 1420, 1422 (10th Cir.(N.M.) 1985) *with State v. Null,* 247 Neb. 192, 526 N.W.2d 220, 229 (1995); *Com. v. Sego,* 872 S.W.2d 441, 443 (Ky. 1994); *State v. Conway,* 193 N.J.Super. 133, 472 A.2d 588 (1984); *State v. Hohensee,* 650 S.W.2d 268, 275 (Mo.App.1982) (*rev'd in part on other grounds*). The focus under the unilateral theory is on the culpability of the defendant, without any necessity to establish the guilty mind of one or more co-conspirators.

When we compare the first sentences of the earlier and current statutes in Wyoming, we find that the old statute began "*[i]f two (2) or more persons* conspire to (a) commit a felony in the state of Wyoming * * *,*" while the new statute reads, "*[a]* person is guilty of conspiracy to commit a crime if he agrees with one (1) or more persons that they or one (1) or more of them will commit a crime * * *.*" (Emphasis added.) Our research discloses that most states that have adopted this second definition of the crime of conspiracy have embraced a unilateral approach to conspiracy, and we hold that is appropriate in Wyoming.

Other states have justified the unilateral theory of conspiracy as sound public policy. A person who believes he is conspiring with another to commit a crime is a danger to the public regardless of whether the other person in fact has agreed to commit the crime. As one text writer has expressed the proposition, "such an approach is justified in that a man who believes that he is conspiring to commit a crime and wishes to conspire to commit a crime has a guilty mind and has done all in his power to plot the commission of an unlawful purpose." FRIEDMAN, *Mens Rea in Conspiracy,* 19 Modern L.Rev. 276, 283 (1956), *adopted in,* 2 WAYNE R. LAFAVE & AUSTIN W. SCOTT, JR., *Substantive Criminal Law* § 6.4(d) n. 109 at 73. Miller's case furnishes a textbook example of the justification for a unilateral approach. Miller's guilty mind was not diminished by the fact that Powell had made an agreement to serve as a law enforcement informant. It is true that Miller's chance of succeeding in kidnapping his family under the circumstances was minimal, but Miller has "nonetheless engaged in conduct which provides unequivocal evidence of his firm purpose to commit a crime." 2 WAYNE R. LAFAVE & AUSTIN W. SCOTT, JR., *Substantive Criminal Law* § 6.4(d) at 73 (footnote omitted). It is our conclusion that we should follow the majority rule of our sister states, and we hold that valid public policy as well as the language and the legislative history of our conspiracy statute make the unilateral approach to conspiracy the law of Wyoming.

In his second issue, Miller argues that there is insufficient evidence to establish a conspiracy to commit the crime of kidnapping between Miller and Ingersoll. This argument is premised upon the assumption that the bilateral theory of conspiracy is the law of the case, and the concession on

the part of the State that Powell could not be a member of the conspiracy. In light of our conclusion that the instruction on the unilateral theory of conspiracy is correct, we have examined the record and are satisfied that there is more than sufficient evidence to sustain Miller's conviction for the crime of conspiracy since under a unilateral theory of conspiracy, the capacity of Powell to engage in the crime of conspiracy is not an issue.

[¶ 50] With respect to the conspiracy, the district court gave this instruction (to which there was no objection):

### INSTRUCTION NO. 17

The elements of the crime of Conspiracy to Commit Aggravated Robbery as charged in this case are:

1. On or about the 6th or 7th day of February 2004

2. The Defendant, Marco Pedro Lemus

3. Agreed with one or more persons

4. That they or one of them would commit the crime of aggravated robbery; and

5. One or more of them did an overt act in Lincoln County, Wyoming, to effect the objective of the agreement.

▉ [¶ 51] Lemus contends that the evidence is insufficient to sustain the conviction. However, when the evidence adduced at his trial is considered in light of the above instruction, it is clear that the evidence does suffice. Lemus confessed that he and the others agreed to contact Leon–Leyva, using Lemus's cell phone at least once for that purpose, so as to arrange a meeting with Leon–Leyva to rob him of the drugs and/or valuables that he might possess. The group obtained steak knives to use as leverage in the proposed robbery. Each of the three conspirators was armed with at least one knife (Lemus had two, and he brandished both as the first to act in the effectuation of the robbery). A member of the conspiracy called Leon–Leyva from a grocery store in Kemmerer to ascertain an exact meeting place in Lincoln County. They did meet up with Leon–Leyva, and he drove into an alley for the purpose of doing a drug transaction. At that time, the robbery plan was executed.

The conspiracy included a contingency plan that if Leon–Leyva resisted, they would kill him. That circumstance came to pass and Lemus was the first to set it in motion. The other conspirators joined in that effort, and Lemus contends that it was the others that dealt the death blows. Although there is no testimony to this effect, only argument, Lemus contended that this whole scenario was a lie he concocted to get his wife in trouble. Lemus asserted that the truth was that they did intend to purchase drugs, but Leon–Leyva had none, and that he attacked Lemus first, intending to rob him. In addition to the fact that there is no testimony to that effect in the record, the jury could, of course, believe Lemus's first story and disbelieve his proposed defense. However, the district court, in an abundance of caution, gave the jury self-defense instructions, and the jury was permitted to consider Lemus's theory of the case.

[¶ 52] We conclude that the evidence was sufficient to sustain the conspiracy conviction, as well as the conviction for felony murder.

### CONCLUSION

[¶ 53] Having found no error in these proceedings, the judgment and sentence of the district court are affirmed in all respects.